HUGHES, Appellant, v. EWING et al.

Division Two, April 23, 1901.

1. **Partnership:** DEMAND FOR MONEY: SILENCE: EVIDENCE. Where plaintiff's right to recover judgment against three defendants on notes signed by one of them is predicated on the theory that the three were partners in the purchase and sale of land, it is proper to permit one of them to testify, as showing there was no partnership, that the one in whose name the title was taken did not call on him for any money towards paying for the land for fifteen months after their written contract was signed, and not until it was apparent that the venture would result in a loss. Such evidence is admissible as showing how the contract was regarded among them.

2. **Finding of Facts:** APPELLATE PRACTICE. Where the finding of facts was separate and apart from the conclusions of law reached by the court sitting as a jury, and no exceptions were saved to such finding, it stands as a special verdict, or an agreed case; and if the conclusions of law under the facts so found were correct, the judgment must be affirmed; otherwise, reversed. But this does not mean that every declaration of law given must have been correct, or that the judgment must be reversed if any error was committed in either refusing or modifying certain instructions offered. On the con-

trary, the result is the test, and if that was in accordance with the facts found and the law of the case, the judgment will be affirmed.

3. ———: PARTNERSHIP: PARTICIPATION IN PROFITS. An agreement to participate in the profits arising from the purchase and sale of lands does not constitute the parties to the agreement partners. Three defendants agreed among themselves that, in view of the location of a large factory by one of them, another would convey to him a tract of land 600 by 2,500 feet for his factory, and buy at least a section of land in the neighborhood in his own name, and after reimbursing himself for the purchase money by selling lots, the profits from such sales would be divided equally between him, the manufacturer and the other defendant who brought them together. The lands were bought on credit, which was not contemplated by the agreement, and notes signed by the one defendant given in payment. Some of the lots were sold by him but not enough to pay the purchase price of the land, the selling price being greatly decreased by a collapse of the land speculations and the failure of the factory, and sometime afterwards the holder of the notes, who had never known any one in the transaction but the ostensible purchaser, brought thereon suit against the three defendants on the theory that they were partners in the purchase of the land. *Held*, that there was no such community of interest as made the defendants partners.

4. ———: ———: ———: BOOKS OF ACCOUNT. And a clause in the agreement to keep books of account showing the moneys paid for the land and the amounts received on the sale thereof, and to keep such books open to the inspection of the others, and the mailing of a trial balance sheet thereof to the other defendants, did not tend to prove the partnership. Each member of a partnership has the right to inspect the books without any agreement, and hence this clause is inconsistent with the theory that there was a partnership.

Appeal from Jackson Circuit Court.—*Hon. Edward L. Scarritt*, Judge.

AFFIRMED.

*Waggener, Horton & Orr, Chas. R. Pence, Claude Hardwicke* and *Elijah Robinson* for appellant.

(1) The court improperly admitted evidence as to whether

or not Ewing had ever demanded a settlement of his co-defendants prior to October, 1888. The right of plaintiff to recover did not depend upon whether Ewing ever demanded such settlement or had a right to demand such settlement. (2) The trial court improperly admitted in evidence the correspondence that passed between the defendants in October, 1888, and the certificate made by Ewing that McMillan had complied with his covenant that the car-works would be constructed. Said letters, as evidence, were incompetent, irrelevant and immaterial, and were simply hearsay evidence, created by defendants nearly two years after plaintiff's cause of action had accrued, and could in no way impair plaintiff's right to recover; and for the further reason that such correspondence was not written in the presence of plaintiff, and because such correspondence appears to have been only an attempt to put a legal construction on a written instrument, which did not meet with the approval of all parties to such instrument, and because the court can construe said written instruments better than the authors of such correspondence. (3) The court erred in refusing to give the first declaration of law asked by plaintiff. The relations of the parties in and to real estate purchased pursuant to, and held subject to, the agreements mentioned in said declaration of law, were such as would exist between parties by, or for whose benefit, real estate was purchased under such circumstances as are described in declaration of law 15, which was modified by the court and given, and, if the trial court had properly construed such agreements, it would have given said first declaration of law. Gouthwaite v. Duckworth, 12 East, 421; Richards v. Grinnell, 63 Iowa 44; Plunkett v. Dillon, 3 Del. Ch. 496; Hymen v. Peters, 30 Ill. App. 134; Wetmore v. Crouch, 150 Mo. 671; Mill v. Sheibley, 68 Ga. 556; Hunt v. Erickson, 57 Mich. 330; Young v. Thrasher, 115 Mo. 222; Myers v. Field, 37 Mo. 434; Manhattan Brass Co. v. Sears, 45

N. Y. 800; Beecher v. Bush, 45 Mich. 188; Tyler v. Wadding-ham, 58 Conn. 375; Beauregard v. Case, 91 U. S. 134; Shulett v. Fairbanks, 40 Ohio St. 233; Sanfley v. Howard, 7 Dana, 367. (4) The court should have given declaration of law asked for by plaintiff, numbered 2, since the purchases were made pursuant and subject to the agreements in evidence. Gouthwaite v. Duckworth, 12 East, 421; Story on Partnership (2 Ed.), sec. 146; Bates on Partnership, sec. 157; Richardson v. Farmer, 36 Mo. 44; Ontario Bank v. Hennessy, 48 N. Y. 548; Bates on Partnership, secs. 443, 444 and 445; Morse v. Rich-mond, 97 Ill. 303; Rumsey v. Briggs, 139 N. Y. 323; Sage v. Sherman, 2 N. Y. 417. (5) The trial court erred in refusing to give declaration of law, asked by plaintiff, numbered 4. Sage v. Sherman, 2 N. Y. 417; Tyler v. Waddingham, 58 Conn. 387; Rumsey v. Briggs, 139 N. Y. 323; Woodward v. Win-ship, 12 Pick. 429; Morton v. Buell, 43 Mo. 113; Little v. Stettheimer, 13 Mo. 572; Beal v. January, 62 Mo. 434.

*McKeighan, Barclay & Watts,* and *Lathrop, Morrow, Fox & Moore* for respondents.

(1) Neither of the defendants, Roraback or McMillan, are liable on the notes in suit. First. Even if it were admit-ted (which it is not) that the contracts given in evidence estab-lished a partnership between the parties thereto, still this would not establish a general trading partnership. A general trading partnership must be established in order to give authority to one partner to execute notes either in the partnership name or in the name of the parties so executing them, or it must be shown that from the constitution or the particular purposes of the firm the power is necessarily or usually exercised. Dear-dorf, Admr., v. Thatcher, 78 Mo. 128; Story on Partnership, sec. 102a. Second. No person can be held as a party to a

promissory note unless some word or words are used in the note furnishing evidence that the party who executed the note did not intend to bind himself, or if he did so intend, that he also intended to bind others. Sparks v. Dispatch Transfer Co., 104 Mo. 531; Farmers' Bank v. Bayless, 35 Mo. 428; Baker v. Bayless, 41 Mo. 275; Story on Partnership, sec. 1. Third. The power and authority of one partner to bind another by the execution of notes depend upon the principle of agency. Meehan v. Valentine, 145 U. S. 618, citing Beckham v. Drake, 9 M. & W. 79, 98; Wilson v. Whitehead, 10 M. & W. 503; Ernst v. Nichols, 6 H. L. Cas. 40. Fourth. A principal can not be held upon a negotiable promissory note made by an agent in his own name, and not disclosing on its face the name of the principal. Sparks v. Dispatch Transfer Co., 104 Mo. 531. Fifth. McMillan and Roraback were not present partners with Ewing, or with Ewing and Coburn, hence the doctrine of dormant partners (whatever that doctrine is) does not apply in this case. Again, the doctrine of Sparks v. Dispatch Transfer Co., supra, applies to such notes even as to a dormant partner. (2) In order to constitute a partnership there must be such a community of interest as empowers each partner to make contracts, incur liability, manage the whole business, and dispose of the whole property of the partnership for its purposes, in the same manner and with the same power as all the partners could do acting together. Bank of Osceola v. Outhwaite, 50 Mo. App. 124; Deyerle v. Hunt, 50 Mo. App. 541; Dwinel v. Stone, 30 Me. 384; Ashby v. Shaw, 82 Mo. 76; Donnell v. Harshe, 67 Mo. 170; Kellogg Newspaper Co. v. Farrell, 88 Mo. 594; Musser v. Brink, 68 Mo. 242; Campbell v. Dent. 54 Mo. 325; Thompson v. Holden, 117 Mo. 118; Farrand, Admr., v. Gleason, 56 Vt. 633; Pulliam v. Schimp, 100 Ala. 362; Holmer v. Railroad Corp., 5 Gray, 58; Darling v. Potts, 118 Mo. 506;

Clark v. Sidway, 142 U. S. 682; McDonald v. Matney, 82 Mo. 364; Blair v. Schaefer, 33 Fed. Rep. 218, 149 U. S. 248. The following are cases which upon the fact in each particular case it was held that no partnership had been established: Roper v. Schaefer, 35 Mo. App. 30; Morton v. Wilson (Ill.), 31 N. E. 168; Demarest v. Koch, 129 N. Y. 218; Cochran v. Anderson, 83 Ky. 36. Second. If, by the terms of an agreement any time is to elapse or any act remains to be done or any fact must first occur before a right to share profits accrues, then the partnership does not exist in any event until such time has arrived, or such act has been performed or such fact has occurred. Lindley on Partnership, 20; Clifton v. Howard, 89 Mo. 192; Story on Partnership, sec. 27; Alfaro v. De La Horre, referred to in 3 Central Law Journal, 473. Third. If by any possibility the partnership idea can prevail in this suit, then it should be held that the payment by Ewing for the land bought was his contribution to the capital of the partnership. It is well established that the other members of a partnership or firm can not be held liable for the capital borrowed by the other partner to enable him to contribute his share. 1 Bates on Partnership, sec. 446; Burns v. Mason, 11 Mo. 469; Evans v. Winston, 74 Ala. 349; Ferson v. Monroe, 1 Foster (N. H.), 462; Elliot v. Stephens, 36 N. H. 311; McTinden v. Wentworth, 51 Wis. 170; Logan v. Bond, 13 Ga. 192; Matlack v. James, 13 N. J. Eq. 126; Pollock v. Williams, 42 Miss. 88; Witham v. Vanwurmer, 44 Ill. 525; Bank v. Sawyer, 38 O. St. 339; Valentine v. Hickel, 39 O. St. 19; Donally v. Ryan, 41 Pa. St. 306; Foster v. Branes, 81 Pa. St. 377; McNaughton's Appeal, 101 Pa. St. 550; Stebbins v. Willard, 53 Vt. 665.

BURGESS, J.—On the twenty-ninth day of January, 1887, and for sometime prior thereto, the defendant William

McMillan was the president of the Missouri Car & Foundry Company, a resident of St. Louis, Missouri, and engaged in the business of manufacturing and selling cars and doing a general foundry business. At the same time the company owned a branch plant in the State of Indiana, which McMillan had decided to move to some point in the immediate vicinity of Kansas City, Argentine, Kansas, being preferred, and to that end he communicated with his personal friend N. T. Spoor, who was then local superintendent of the Atchison, Topeka & Santa Fe Railroad Company, with the view of ascertaining at what price suitable land could be purchased for the purpose of locating said branch works. Spoor turned the matter over to the defendant Roraback, who communicated his object to defendant Ewing. Defendants Ewing & Coburn were then partners in the real estate business in Kansas City, and had been for sometime engaged in buying and selling lands for themselves and for others in and about said city, and were well posted with respect thereto. As a result of the communications between Ewing and Roraback, a meeting was arranged for between them and McMillan, at the latter's house in the city of St. Louis, on the twenty-fourth day of January, 1887, when the following contract was entered into between them, to-wit:

"This agreement made and entered into this twenty-fourth day of January, A. D. 1887, between William McMillan of the city of St. Louis, Missouri, party of the first part, and John Z. Roraback, of the City of Kansas and State of Missouri, party of the second part, and W. N. Ewing of the City of Kansas and State of Missouri, party of the third part. *Witnesseth,* that whereas, the said party of the first part intends forthwith to found, build and carry on a large foundry and car works at or near Argentine, Kansas, which said foundry and car works will occupy a large space of ground and employ

a large number of workmen, and the location of said works will presumably greatly enhance the value of land in the vicinity of said works. And, whereas, it is the intention of said third party to purchase land in the neighborhood of said foundry and car works for the mutual benefit of the parties hereto. Therefore, it is agreed that the said party of the first part and second part shall designate where the said foundry and car works shall be built, and the said party of the third part shall forthwith proceed to buy all of the land in that vicinity, that it is possible to get, at the lowest possible price, and in such manner as to avoid as far as possible the enhancement of values until all of the lands possible shall have been bought, and the said third party shall furnish all the money for such purposes and defray all the expenses thereof, and pay all taxes and special assessments and dues on said lands promptly and so as to avoid all penalties and discounts and that no advances of the said third party shall bear interest. The said purchases and payments shall be made as far as possible without commissions, and in no event shall the said third party or any firm he may be connected with charge any commissions or rebates, or receive any share of any commissions or rebates but where possible, the said party of the third part or any firm with which he may be connected shall exact their share of any commissions or rebates in any sales or payments according to the regular course of trade, and the said share of rebates or commissions shall be paid and accounted for, for the benefit of all the parties hereto.

"It is further agreed that a strip of land twenty-five hundred feet long by six hundred feet wide is to be deeded by the said party of the third part to said party of the first part, for the sum of one dollar, for the purpose of building said foundry and car works thereon as soon as said strip of land shall be designated by said party of the first part.

Hughes v. Ewing.

"It is further agreed that the rest and residue of said land shall be sold as soon as may be for the best interests of the parties hereto, and that the cost price of the said lands, together with the cost price of the lands deeded to said party of the first part for the erection of the works, and all necessary expenses incurred in making said purchases, shall be first repaid to said party of the third part without interest on the same or any rebate or commission to said party of the third part, or any firm with which he may be connected, from the moneys received from the first sales of said lands, and the remainder received from the sales of said lands shall be divided equally between the parties hereto, share and share alike, within ten days from receipt of same by said party of the third part, provided there is of said money on hand the amount of three thousand dollars which shall have been received from sales of said land by said party of the third part.

"It is further agreed that the said lands, other than the land so set off for the said foundry and car works, shall be sold and the profits divided by the first day of April, A. D. 1888, unless otherwise mutually agreed by the parties hereto, and that if any lands remain unsold at the said above-mentioned date, the same shall, unless otherwise mutually agreed (after the cost price and all expenses for all lands purchased under this contract shall have been repaid said party of the third part), be divided between the parties hereto, share and share alike, and all necessary deeds mutually executed.

"It is further agreed that all lands purchased under this agreement shall be entered by said party of the third part in separate books to be kept for such purposes and that the cost price, commissions, rebates and expenses of every nature incurred in the purchase and sale of said lands, shall be forthwith entered in said books, and that the said books shall always be kept open to each of the parties hereto, their agents or attorneys. That the

said party of the third part shall use his knowledge of the location of said works only for the benefit of the parties hereto, and that all the land in the neighborhood of said works purchased by said party of the third part, either directly or indirectly in his own name, or in the name of any other person or persons whatsoever, and all lands to be purchased in the neighborhood of said works by any person or persons, at the suggestion of said third party or by any knowledge derived from the said third party wherein said third party shall have any share, or wherein he shall derive any benefit, shall be deemed to be purchased subject to this agreement and for the joint benefit of the parties hereto, share and share alike, and any and all such share or interest or advantage or profit of the said party of the third part, shall be for the joint benefit of the parties hereto, and all such purchases, interests, advantages, or shares shall be forthwith entered in said books and accounted for to the first and second parties.

"It is covenanted by the said party of the first part that the said foundry and car works shall be located upon the strip of land before designated and agreed upon, and that the said foundry shall be completed within six months from the date of this contract and shall have a capacity of not less than one hundred car wheels and ten tons of castings per day. And it is further agreed that the said car works should be completed within twelve months from the date of this contract, and shall have a capacity to manufacture not less than eight finished freight cars per day.

"It is further agreed that a written certificate from C. W. Smith, Esq., first vice-president, Atchison, Topeka & Santa Fe R. R., or from any other person mutually agreed upon by the parties hereto, certifying that such is the capacity of said foundry and car works, shall be considered sufficient proofs that the above agreement has been complied with. It is further

agreed by said party of the first part, that in case the above agreement is not complied with by him, or by a corporation in which he is interested, that he will upon demand of the said party of the third part, assume all contracts for lands made by said party of the third part, under this contract, and will reimburse and repay to said party of the third part all actual moneys paid out by him in obtaining said contracts for lands thus purchased under the same without interest on the same.

"It is further covenanted and agreed, that if any of the said lands be sold for notes or bonds, secured by mortgage, the same shall be divided by the parties hereto, share and share alike, after all original purchase price and necessary expenses shall have been repaid to said party of the third part. It is agreed to be the sense of the parties hereto, that all lands purchased under this agreement, other than the lands to be deeded to said party of the first part for said works, shall be owned as partners, share and share alike, by the parties hereto, after all original purchase price and necessary expenses for all of said lands have been repaid to said party of the third part, but for convenience, the said lands shall be in the name of the said third party, and all the active work in purchasing and selling lands shall be done by him, and all lands to be purchased in the vicinity of said works and all advantages, purchases, profits or benefits derived by either of the said parties hereto, arising from the knowledge of the contemplated location of said works, and all real estate purchased by either of the parties hereto, shall be for the mutual benefit of all parties hereto, share and share alike.

"It is agreed that the services of the parties hereto shall be rendered without pay and that the share in the profits of the contemplated undertaking shall be the only and sufficient consideration for this agreement and the respective services of the parties hereto.

"It is further agreed that the sense of this contract is, that the said party of the third part shall purchase not less than three-eighths of a section of land; it is, however, agreed by the parties hereto, that the number of acres or quantity of land in excess of three-eighths of a section to be purchased under this contract, shall be discretionary with the said party of the third part and may be increased as in his judgment would be for the mutual interest and profit of all the parties hereto, said land to be purchased at or near Argentine in the State of Kansas; should said third party be unable to purchase said three-eighths of a section of land at a satisfactory price, then this contract shall lapse and be of no effect. This contract shall not apply to lands purchased prior to the first day of January, 1887, by either of the parties hereto, but only to lands purchased subsequent to that date. In witness whereof the said parties have hereunto signed their names and affixed their seals in duplicate, on the day and year first above written."

Soon after the execution of the contract Ewing found that he could not buy lands at Argentine at a reasonable price, and, accordingly, the basis of operations was changed to Clay county, Missouri, and the supplemental agreement of March 10, 1887, executed, which is in words and figures as follows:

"Memorandum of agreement made this tenth day of March, A. D. 1887, by and between the several parties whose names are hereto subjoined, that is to say: Whereas the said parties by the designation of the party of the first part, the party of the second part and the party of the third part, respectively, are held and bound to and with each other in a certain agreement made between them, on the twenty-fourth day of January, A. D. 1887, a copy whereof is hereto annexed. And, whereas, it is proposed and agreed by the parties hereto to modify the terms of said contract in the particulars hereinafter specified and set forth, which modifications are to form

a part of said contract and said contract, except as herein modified, is continued and in full force. Now, therefore, the said parties in consideration of said former agreement and the agreement to modify the same, mutually entered into and assented to by them, respectively, do hereby assent to and agree upon the following changes in said contract, to-wit:

"First. That instead of founding, building and carrying on the manufacturing works mentioned and provided for in said contract, and instead of the purchase of lands in the vicinity of said works, at or near Argentine, Kansas, the said works are to be founded, built and carried on on a part of sections one and twelve, township 50 of range 32 in Clay county, State of Missouri, and the purchases of land to be made in the immediate vicinity of the location of said works, as now provided, instead of at or near Argentine, Kansas.

"Second. The tract or tracts to be purchased by said third party, to be included in the terms of the contract, hereinbefore referred to, shall be subject to the change of location hereinbefore provided, be in the vicinity of the works at the new location above provided for and include such property as said third party may be reasonably and fairly able to procure at fair price and shall not be less than one section of land.

"Third. The time for the completion of the foundry in said contract provided for, ready for operation, is extended to the thirty-first day of December, A. D. 1887, and for the completion of the car works in said contract provided for to the thirty-first day of December, A. D. 1888. Except as hereinbefore stated, and provided for, the said contract of which this is a part is in all things ratified, confirmed and continued in force."

In accordance with the terms of the contracts, Ewing purchased certain land of the plaintiff at the price of $32,245, but

Vol 162 mo—18

instead of paying cash therefor as provided by the contracts he paid $8,061.25, in cash, and to secure the balance of the purchase money he on the seventh day of July, 1887, executed to Hughes his three individual promissory notes each for the sum of $8,061.25, due, respectively, on or before one, two and three years after date, bearing eight per cent interest per annum from date and secured by deed of trust upon the land purchased. Thereafter, Ewing made certain payments on the principal and interest of the note which first fell due, and certain interest payments were made by him on the other two notes.

A site for the branch foundry and car works was selected by McMillan and Roraback on other lands bought by Ewing in the vicinity, and said works were completed within the time limited in the supplemental contract. Ewing caused the lands purchased by him to be subdivided, and made sales thereof from time to time at such prices and upon such terms as he fixed. Neither McMillan nor Roraback ever made a sale or fixed a price upon a single tract of land, or interfered or attempted to interfere in any way with Ewing in the management or disposition of the same. Books of account were kept by Ewing, as agreed, and the same were examined by Roraback and trial balances therefrom sent from time to time to McMillan.

In the latter part of 1887 or the early part of 1888, the lands purchased by Ewing under the contracts between defendants McMillan, Roraback and himself greatly depreciated in value so that Ewing was unable to realize a sufficient sum to reimburse him for the amount he had paid and agreed to pay in the purchase of the lands. And on the tenth day of October, 1888, he addressed a letter to McMillan, and sent one of a similar character to Roraback in which he referred to the contract between the parties as one under which McMillan and Roraback, "were to have an interest in certain prospective prof-

its in lands in Clay county, Missouri." The letter to McMillan (the letter to Roraback being substantially the same), is as follows:

"Kansas City, Mo., October 10, 1888.

"Wm. McMillan, Esq., St. Louis Mo.

"Dear Sir: We are much disappointed that you were unable to attend the meeting of your company, which was held here on the twenty-ninth of September, as we wished to talk over a matter of business with you. The matter we refer to is the contract between our Mr. Ewing, yourself and Mr. Roraback, whereby you were to have an interest in certain prospective profits in lands in Clay county, Missouri, at and about the town of Birmingham. As you will see by looking on the third page of the aforesaid contract, it is provided that on the first day of April of this year, a division of the assets which shall then remain unsold after the money advanced by us has been repaid us, is spoken of; notwithstanding our utmost and best endeavors nothing like sufficient property had been sold at that date, nor has been sold since, either to repay us what we have advanced, or to take up the incumbrances, which are a lien upon the land. Under these circumstances we believe a fair interpretation of the contract to be, that your interest in it has come to an end, as, in accordance with the section of the contract which we have already mentioned, a state of affairs was most clearly contemplated, which have never yet come to pass. We are addressing you this letter to notify you of our understanding of the business as being to the effect we have above indicated, and further to say, however, that we believe as a matter of justice to you in the common undertaking, you should still continue to be a partner in the prospective profits which may arise from the sales of said lands, provided you assume an equitable position with regard to the money we have already advanced, and the payments to be made upon the

lands. To bring this matter definitely before you, we make the following statement: We originally invested in the lands the sum of $63,594.83 in cash, since which time we have advanced to meet payments $7,635.63. We have sold for cash and notes, land to the amount of $48,410. There are payments becoming due on the land at various times during the next three years, and bearing interest at the rate of eight per cent per annum, to the amount of $108,884.89. An equitable arrangement in view of all the circumstances, it seems to us is, that you and Mr. Roraback should each of you refund to us one-third of all the cash we have invested, and assume the payments, each of you, of one-third of the amount of incumbrances on the land. This, of course, would entitle each of you to one-third of the assets of the company, and to a similar portion of any profit that may arise from the sales of the land. If the matter can be put in this general shape, we shall be willing to carry on the enterprise on that basis, and if not, we shall be obliged to make such other arrangements as will relieve us of the burden of the heavy payments, which come due upon the land. As this is an operation of some magnitude and as there are parties who we think would be willing to buy an interest in the land at the cost price, we must ask you that within a reasonable time you will signify to us what you desire to do in the premises.

"We are, very truly yours,

"W. N. Ewing, By Coburn & Ewing."

On October 13 McMillan replied to Ewing's letter, and on October 16, Roraback did the same. Both letters are of substantially the same tenor and effect. McMillan's letter is in words and figures as follows:

"St. Louis, Mo., October 13, 1888.

"W. N. Ewing, Esq.,

Kansas City, Mo.

"Dear Sir: I have to acknowledge your favor of the

tenth inst. concerning the contract between Mr. Roraback, your-
self and myself, in regard to our interest in lands in and about
the town of Birmingham, Clay county, Missouri, under our
contract of the twenty-fourth day of January, 1887, and the
supplemental agreement between the same parties made on
the tenth day of March, 1887.

"I am at a great loss to understand by what process of
reasoning, or by what mode of interpretation, you reach the
conclusion, that by the terms of this contract you have in your
power to terminate my interest in the lands purchased by you,
and it may as well be distinctly understood between us, at
this time, that I not only repudiate your construction of this
contract, but I intend that you shall live up to the very letter
of the same.

"I have never agreed, and do not propose to be forced into
an agreement, to advance any money to pay for the purchase
of the real estate which you have bargained for under the
terms of our contract.   You are aware of the fact that I have
faithfully carried out every obligation imposed upon me by
the terms of this contract, long in advance of the limit of time
fixed therein for such performance, as your certificate, which I
now have, fully recites.   The contract requires you to furnish
all the money for the purchases that you make of land contem-
plated to be acquired, and defray all expenses thereof, and pay
all taxes and assessments due on said land promptly, and
further provides that no such advances shall bear interest.
This you have not done, as I am informed by the reports you
have sent me, and by your letter, but on the contrary you have
only made partial payments on account of such purchases, and
the lands now stand charged with a vendor's lien, as well as
deeds of trust, to secure deferred payments, amounting to over
one hundred thousand dollars, and your reports show that

these deferred payments bear interest at eight per cent per annum.

"My attorneys inform me that a fair and legal interpretation of the obligations of this contract on your part obliges you to pay cash for the purchases which the contract contemplates shall be made thereunder, and that you have no right whatever to charge in your account a dollar of interest on the account of these deferred payments. I am also advised by them that you have no authority under this contract to sell any of these lands until they are free from the incumbrance now outstanding upon them.

"The interpretation which I put upon this contract is reinforced by the very provision which you refer to in your letter, and which is found on the third page of said contract, in that part of the agreement which provides 'that if lands remain unsold at the said above mentioned date (April 1, 1888), the same shall, unless otherwise mutually agreed, after the cost price and all expenses for all lands purchased under this contract shall have been repaid said party of the third part, be divided between the parties hereto, share and share alike; and all necessary deeds mutually executed.' From the above provision it will readily be seen that the contract makes no provision for a division of these lands, subject to incumbrance, after your advances have been paid, but the contract all the way through contemplates that the purchase which you make under it, shall be for cash, and it is also equally specific in regard to its provisions that you shall not charge any interest for the purchase price of this property.

"Furthermore, you are aware that this contract was extended on my behalf until the last day of December, next, within which I should complete the works contemplated to be built. Whether this contract extended the time for the division of this property or the sale thereof, it is not necessary to

determine at the present time, but you know that from the first day of April, down to the present time, not one word has been said by me concerning a division of the property under the terms of this contract, nor as to what the rights of the parties were, after that date.

"It seems quite evident that your idea is, because you have not been able to sell the lands as readily as you expected to do, when the contract was executed, you propose trying to force me into the position of assuming obligations and responsibilities which you voluntarily assumed by the terms of this contract. This I am not prepared to do. I have, as you know, expended large sums of money, beyond what I anticipated doing, in establishing our works, and by crowding my business, under great obstacles, and employing a large number of laborers, have greatly assisted your opportunities of disposing of this land.

"You complain of the burden of the heavy payments which become due upon this land in the future. If you had lived up to the terms of this contract, these burdens would not be staring you in the face in the way of incumbrances upon this property.

"Trusting that I have made myself understood in this matter, I remain,

"Very respectfully yours,

"Wm. McMillan."

The contracts were duly acknowledged and filed for record in the recorder's office of Clay county on the first day of November, 1888.

The amended petition upon which the case was tried declared upon three promissory notes given by Ewing to plaintiff for the balance of the purchase money for the land bought from him, alleging that the defendants were partners and had caused the notes to be executed in the name of Ewing.

In addition to these counts the petition contains a fourth count in which the contracts between the parties were set forth and a recovery sought for the unpaid purchase price for the lands, on the theory that by the contracts defendants were partners, and that Ewing, under his authority as such and in pursuance of the terms of the contracts, had bought the land for the partnership and had promised to pay the remainder of the purchase price, aside from the cash payment, at the terms designated in the promissory notes, with eight per cent interest.

The answers of McMillan and Roraback were general denials of the allegations in the petition, and as to the notes sued on, pleas of *non est factum* duly verified by affidavit, and with respect to the fourth count, pleas of payment.

At the request of both parties the court made the following finding of facts.

"For some time previous to the twenty-fourth day of January, 1887, William McMillan, the defendant in said action, was president of the Missouri Car & Foundry Company, a large manufacturing enterprise at St. Louis, Missouri, and was a resident of that city. The said company manufactured and sold cars and carried on a general foundry business. In the latter part of the year 1886, the said Missouri Car & Foundry Company had a branch plant in the State of Indiana. About that time, the said McMillan determined to remove the branch plant to some point in the immediate vicinity of Kansas City. The place which he first had in view for the location was Argentine, Kansas, and being intimately acquainted with Mr. N. T. Spoor, then local superintendent of the Atchison, Topeka & Santa Fe Railroad Company, he asked him to ascertain at what price suitable land could be purchased for the purpose of locating said branch works. Mr. Spoor turned the matter over to the defendant Roraback, then agent of the railroad company, with whom McMillan also had a slight ac-

quaintance.  Said Roraback communicated his object to said Ewing.  The said Ewing & Coburn were partners in the real estate business in Kansas City, and had been for some time engaged in buying and selling land for themselves and for others and had had considerable experience in such business at, and in the vicinity of, Kansas City.

"Ewing and Roraback communicated with regard to said project of McMillan, and Ewing proposed that he would buy the lands in his own name, at or near Argentine, favorable for the location and operation of the contemplated works; that he would deed absolutely to said McMillan or his company a certain amount of ground sufficient for said works, as a bonus, or free of charge; that when said location should be approved by McMillan, he would then buy all the lands in the vicinity, before it should be known that said works were to be erected at that place; that he would supply and furnish all the money that was necessary to purchase the lands; that the lands should be within a certain time sold out, and after he, Ewing, had been reimbursed for the purchase price, taxes, assessments and expenditures, the profits should be divided equally between the three, and that neither Roraback nor McMillan were to put up any money or be responsible for any.

"At the request of Ewing, a conference was arranged for, between Ewing, McMillan and Roraback.  Within a day or two thereafter, Ewing and Roraback went to St. Louis to see McMillan at his house, and the same proposition was repeated by Ewing to McMillan.  It was provided, that the lands should be bought by Ewing in his own name, and held, as provided in the written contract herein referred to, dated January 24, 1887, and paid for by Ewing with his own money, and that after the lands had been sold out, and Ewing reimbursed for the purchase price, taxes, assessments and expenditures, the profits should be divided equally between the three; that Ewing

was to pay for the lands, and his sole source of reimbursement was to be from sales of the lands by himself; and that neither Roraback nor McMillan were to take any part in the purchase or sale of the lands, and neither of them, as a matter of fact, ever did take any part in the purchase or sale of the lands, nor were they ever consulted about the same. McMillan accepted the proposition, and the contract in evidence, dated January 24, 1887, was made and executed by the parties.

"After the execution of said contract, dated January 24, 1887, Ewing tried to buy lands at or near Argentine, which would be suitable for the proposed works, but was unable to do so. Whereupon, the location was changed to sections 1 and 12, township 50, north, of thirty-second range, in Clay county, State of Missouri, and memorandum of agreement was made with respect thereto, being the same that is in evidence, dated the tenth day of March, 1887.

"McMillan complied in all respects with the terms and conditions of the contract requiring action on his part, and so did Roraback. McMillan located and completed the works within the time designated, and as set forth in the modified agreement of March 10, 1887, and obtained for Ewing from the official named, the formal certificates provided for, showing compliance on his part. Ewing made McMillan a deed of the ground which the contract provided for, and he in turn deeded it to the Kansas City Car & Wheel Company, a corporation, which he had caused to be organized under the laws of Missouri, for the purpose of owning and operating the works in question, for the consideration of $34,430. Ewing opened books for the entry of lands purchased and sold, together with cost price, commission and expenditures, as provided by the contract, and from time to time made trial balances and sent the same to McMillan and Roraback. The lands which had been bought by Ewing were not sold by the first of April,

1888, nor had a sufficient amount been realized from the sale of those portions which had been sold, to reimburse Ewing for the purchase price, taxes and assessments. That some four hundred acres of land bought remains unsold, and is covered by mortgages given for the purchase money.

"On October 10, 1888, Ewing, in behalf of himself and the firm of Coburn & Ewing, wrote to McMillan and also to Roraback, claiming that inasmuch as the lands had not been sold within the time designated, and inasmuch as Ewing had not been reimbursed, he, Ewing, was not obliged to carry the lands farther without interest on the purchase price, and that, therefore, the joint interest of the parties in the prospective profits had ceased, and that if McMillan and Roraback desired to continue their interest in the prospective profits, they should contribute a third, each, of the purchase money.·

"McMillan and Roraback separately answered these communications October 13, 1888, taking issue with the same as to the point made by Ewing, that all interest in prospective profits had ceased April 1, 1888, and questioning Ewing's right to terminate their interest in the lands, and complaining that Ewing had not furnished the money and paid for the same, as contemplated and provided for in the contract.

"Among the purchases made by Ewing was a certain tract of land bought of the plaintiff, as set forth in the fourth count of plaintiff's amended petition. The purchase price of this land was $32,245, of which Ewing had paid $8,061.25, leaving as a balance $24,183.75, for which notes were given by Ewing in his own name, and which are set forth in the first, second and third counts of plaintiff's amended petition. Ewing executed back, as security for said notes to said plaintiff, a deed of trust on the property conveyed to W. N. Ewing. Ewing made payments on account of the notes, as set forth in the petition. Hughes, at the time of the sale of said land and

the execution of the notes and deed of trust, did not know of the agreements and arrangements between the defendants hereinbefore set forth, and only learned of the same a short time before he brought this action.

"Defendant McMillan knew nothing about the value of lands in and around Kansas City, and neither did Roraback. At the date of the contract of January 24, 1887, there was great activity in lands in and around Kansas City, resulting in what was generally known and called the 'boom,' which boom, however, collapsed sometime during the year 1887, or early in 1888, and with it the land deal and also the car and foundry works.

"It was not intended by the agreements referred to, that McMillan and Roraback should become present partners in the purchase of said lands, or that they should in any way become liable for the purchase price of said lands or on any notes given therefor. Their interest was to be a contingent interest in the profits, after the lands had been sold and Ewing reimbursed.

"The said Ewing was alone to be responsible for the purchase price of said lands. The venture was, in fact, a part of the general business of Ewing & Coburn, the said McMillan being given a one-third interest in any contingent or prospective profits, by reason of the service to be rendered by him in locating, constructing and operating the works set forth in the agreement, as it was supposed that the location, construction and operation of the said works would increase the value of the lands, and the sale of the lands result in large profits to all concerned. Roraback was to be given by Ewing a third interest in the profits, by reason of the fact that he had brought Ewing and McMillan together."

Plaintiff then asked the court, sitting as a jury, to declare the law to be as follows:

"1.   The agreements offered in evidence, dated January 24, 1887, and March 10, 1887, created partnership relations between the parties thereto in the ownership of all the real estate purchased thereto in the neighborhood of the proposed location of the car works.

"2.   By virtue of the contract of January 24, 1887, as modified by the subsequent contract of March 10, 1887, and the purchase of the lands, described in the petition, by Ewing for the joint and mutual benefit of the parties to such contract, and the subsequent dealings of the parties to the contract concerning their joint venture, the plaintiff was and is the creditor of the parties to such contract, viz., Ewing, McMillan and Roraback; Ewing being the active or ostensible partner, and McMillan and Roraback being the dormant or undisclosed partners in the transaction.

"3.   It is not necessary for the creation or existence of a partnership for the parties thereto to agree upon any name for the firm.   When no name has been agreed upon, the name in which the business of the firm is conducted, if with the consent and approval of all the partners, will be regarded as the name of the firm and presumed to have been adopted.   And if such name be the name of one of the members of the firm, or if certain transactions of the firm are conducted in the name of one of the members thereof, and a note is given by such member to evidence indebtedness of the firm, contracted in one of such transactions, if with the knowledge and consent of all the members of the firm, and under such circumstances as will not constitute an election by the creditor to look to such partner only, then the name of such partner to such note will be regarded as to such creditor as the name of the firm, unless he otherwise elects.

"The agreement of January 24, 1887, conferred upon defendant Ewing authority to buy real estate for the benefit of

the parties thereto, in the neighborhood of the proposed works, and provided that such real estate, after dedication or conveyance of a portion of it for a purpose that was expected to increase the value of the remainder thereof, should be sold and the profits divided between such parties.

"If in buying real estate pursuant to such agreement, defendant Ewing exceeded such authority, in such a manner as would be a clear departure from such authority, and the real estate so bought was conveyed to defendant Ewing, and held by him for the benefit of the parties to such agreement pursuant to such purchase, then his co-defendants, upon having knowledge of his having so exceeded such authority in such purchase, had a right to repudiate such purchase. But it was their duty to exercise such right within a reasonable time after having knowledge of any such excess of authority, and a failure to exercise such right within a reasonable time after having such knowledge, would be regarded as ratification of such purchase.

"Ratification of such purchase could be either expressed or implied, and after once being made could not be revoked, and, if, at any time after having knowledge of any such excess of authority, the contesting defendants claimed any rights or benefits under and by virtue of any purchase so made by defendant Ewing, in which he exceeded such authority, they must be deemed to have ratified such purchase and the terms thereof.

"To relieve themselves of liability on any purchase so made by defendant Ewing, the contesting defendants must show that they are ready, able and willing to release to the vendor all rights and benefits acquired by them under or by virtue of such purchase, which they have not done in this case.

"5.    The interest of all such parties in such real estate began and became vested at the time the purchases were so

made, but subject to equities existing between them as partners.

"6. If it appears from the evidence that the real estate purchased from plaintiff was purchased pursuant to such agreements, that at the time of the sale thereof it was not known by plaintiff that such real estate was being purchased by and for defendant W. N. Ewing and his co-partners, and that the fact that said W. N. Ewing had partners, who were interested in such purchase, was unknown to plaintiff, or that defendants, McMillan and Roraback, were partners in such purchases was unknown to him, then all for whom said real estate was purchased became liable to plaintiff for the purchase price of said real estate; and plaintiff has a right to recover from all persons so liable, unless, after becoming acquainted with the facts in regard to the relations of the parties to said agreements, he elected to look to defendant Ewing only for payment.

"7. The taking of notes signed 'W. N. Ewing,' as evidence of deferred payments of the purchase price of said real estate, was not an election to look to W. N. Ewing only for payment, unless such notes were taken as the notes of said W. N. Ewing only after becoming acquainted with all of the facts in regard to the relations of said Ewing and his co-defendants.

"8. There is no evidence showing, or tending to show, that plaintiff ever elected to look to defendant Ewing only for payment after becoming acquainted with all such facts.

"9. If said real estate was purchased pursuant to such agreements and the notes offered in evidence and delivered into the custody of the court, taken as evidence of deferred payments of purchase price of said real estate, and at the time said notes were executed and delivered to plaintiff it was not known to plaintiff that defendant Ewing was not purchasing for himself alone, but for himself and his co-partners, and it

was unknown to plaintiff at that time that defendant Ewing had partners in such purchase; that said real estate was at the time entered into the books kept for said partners pursuant to such agreement as an asset of said partners and said notes were at the time entered in said books as bills payable by said partnership, and that all parties to said agreement, after learning the terms upon which the real estate was purchased and the manner in which such deferred payments were evidenced, and that such real estate and notes had been so entered in said books, claimed an interest in such real estate by virtue of such purchase, or failed to, within a reasonable time after knowing the manner in which such purchase was made, and book entries were made, to renounce any and all rights they so acquired by virtue of said purchase, it will be presumed that as to plaintiff the name 'W. N. Ewing' was the name adopted by such partners for making such purchase and giving such notes, and that such partners ratified the use of such name for such purposes, although said Ewing's partners may have expected him to advance more money for the payment of said notes at their maturity, if enough money had not been at that time realized from sales to meet such payments, and plaintiff, after discovering the existence of such partnership, had a right to elect to treat such notes, either as the notes of said Ewing only, or, as the notes of such partnership, and if, after making such discovery, he elected to look to such partnership, and not to said Ewing only, he is entitled to recover on said notes from all who were, at the time of such sale and delivery of said notes, members of such partnership.

"10.   The agreements offered in evidence being reduced to writing and executed and delivered by the parties thereto, the law will not presume that they improperly stated the intentions of the parties thereto at the time, nor admit or consider any evidence before the court for the purpose of varying

or contradicting any of the terms or purposes of said agreements as therein expressed. But evidence of the manner in which business was carried on pursuant to such agreements may be admitted for the purpose of showing the intentions of said parties not expressed in such agreements, or construing said agreements in regard to matters not clearly expressed therein. Evidence is also admissible for the purpose of showing any departure from the expressed terms and purposes of said agreements, or waiver of any of the terms or purposes thereof between the parties thereto prior to the date of the notes sued on, but no evidence of any waiver or departure subsequent to the date and delivery of the notes sued on is admissible against plaintiff; and no evidence of anything said, written or agreed to by and between defendants subsequent to the delivery of said notes, and not in the presence of plaintiff, is admissible against plaintiff for the purpose of showing any departure from, or waiver of, any of the terms expressed in said agreements.

"11. No departure from, or waiver of, the terms of said agreements subsequent to the delivery of such notes, or any agreements made and entered into by and between the parties thereto subsequent to the delivery of such notes, can relieve any of the defendants of their liability to plaintiff, unless shown to have been agreed to by plaintiff.

"12. No restrictions or limitations between the parties to said agreement on the powers usually conferred upon partners for such purposes as such partnership was created for, can limit or restrict the liability of any of the parties to such agreement to plaintiff, unless such restrictions or limitations were known to plaintiff at the time of taking the notes sued on.

"13. Partnerships, when formed for the purpose of buying real estate and selling it for profit, are governed by the

Vol 162 mo—19

same rules of law, as for buying personal property, and selling it for profit. For the purposes of such partnerships, such real estate will be treated the same as personalty, except as modified by the rules of law in regard to conveyances of real estate, and there may be active and dormant partners in such partnerships who will have the same legal relations and liabilities to creditors of such partnerships as active and dormant partners in partnerships for the purpose of buying personal property, and selling it for profit.

"14. All persons by whom, on whose behalf, or for whose benefit a purchase of property is made, pursuant to agreement between them, are liable for the price thereof to the party dealt with, whether known in the transaction or not, unless the party dealt with, knowing the facts in regard to their relations in the purchase, otherwise elects. Such liability is a legal obligation and does not depend upon an agreement by or between the purchasers that they shall be so liable, and can not be voided or limited by an agreement between them that they shall not be so liable, unless the party dealt with either expressly or impliedly agrees that they shall not be so liable.

"15. Parties who agree to buy property, and at the same time agree to sell the same and divide the profits, or who agree that property shall be bought by or for them, or for their benefit, and at the same time agree that such property shall be sold and profits divided between them, or at the same time agree that a portion of it shall be divided or conveyed for a purpose that is expected to make the remainder thereof more valuable, and that the remainder thereof shall be sold, and profits or proceeds divided between them, after settling such advances as may be made by any of them for making such purchases, are partners, as to parties dealt with, in the purchase and sale of any and all property purchased and sold pursuant to such agreement, and liable as partners to all parties dealt with in making such

purchases, regardless of any agreement between them to the contrary, unless parties dealt with pursuant to such agreement otherwise, either expressly or impliedly, agree.   And it is immaterial whether the parties to such agreement consider such agreement a partnership agreement, or expressly declare that it is not a partnership agreement, and they can not limit, avoid or postpone their liabilities to persons dealt with pursuant to such agreement by declaring therein that they are not to be partners, or that they are not to be partners until some future date, or until after the happening of some contingency.

"16.    Parties who enter into an act pursuant to an agreement, which is in fact a partnership agreement, are partners, notwithstanding any declaration by them to the contrary; and can not, by any agreement between themselves that they shall not be partners until some future date, or at all, escape or avoid their liability as such partners.

"17.    Under the law and the facts as found by the court from the evidence as produced, including the books offered in evidence, the plaintiff is entitled to judgment against all parties to the agreements offered in evidence for the balance due him for the real estate sold by him, with interest thereon."

The court gave the declarations of law numbered 3, 7, 8, 10 and 13, but refused to give said declarations of law numbered 1, 2, 4, 5, 6, 9, 11, 12, 14, 15, 16 and 17, to which ruling of the court in overruling and refusing to give said declarations of law so numbered, the plaintiff at the time excepted.

Of its own motion the court modified, and gave as modified, declarations of law asked for by plaintiff, numbered 11, 12, 15 and 16, which declarations of law, after being so modified and given by the court, were in words and figures as follows, viz. :

"11.    No departure from, or waiver of, the terms of said agreements subsequent to the delivery of such notes, or any

agreements made and entered into by and between the parties thereto subsequent to the delivery of such notes, can relieve any of the defendants of their liability, if any, to plaintiff, unless shown to have been agreed to by plaintiff.

"12.   No restrictions or limitations between the parties to said agreement on the powers usually conferred upon partners for such purposes as such partnership was created for, can limit or restrict the liability, if any, of the parties to such agreement to plaintiff, unless such restrictions or limitations were known to plaintiff at the time of taking the notes sued on.

"15.   Parties who agree to buy property, and at the same time agree to sell the same and divide the profits, or who agree that property shall be bought by or for them, or for their benefit, and at the same time agree that such property shall be sold and profits divided between them, or at the same time agree that a portion of it shall be dedicated or conveyed for a purpose that is expected to make the remainder thereof more valuable, and that the remainder thereof shall be sold, and profits or proceeds divided between them, after settling such advances as may be made by any of them for making such purchases, are partners, as to parties dealt with, in the purchase and sale of any and all property purchased and sold pursuant to such agreement, and liable as partners to all parties dealt with in making such purchases, regardless of any agreement between them to the contrary, unless parties dealt with pursuant to such agreement otherwise, either expressly or impliedly, agree.   And it is immaterial whether the parties to such agreement consider such agreement a partnership agreement, or expressly declare that it is not a partnership agreement, and they can not limit, avoid or postpone their liabilities, if any, to persons dealt with pursuant to such agreement by declaring therein that they are not to be partners, or that they are not to be partners until some future

date, or until after the happening of some contingency.

"16.    Parties who enter into an act pursuant to an agreement, which is in fact a partnership agreement, are partners, notwithstanding any declaration by them to the contrary; and can not, by any agreement between themselves that they shall not be partners until some future date, or at all, escape or avoid their liability, if any, as such partners."

Plaintiff then and there excepted to said modifications by the court of said declarations of law numbered 11, 12, 15 and 16.    No declarations of law were asked by defendants.

Judgment was then rendered in favor of defendants Coburn, McMillan and Roraback in all the counts in the petition, and in favor of plaintiff and against defendant Ewing.

Plaintiff appeals.

While the defendant Roraback was testifying as a witness in his own behalf he was permitted to state, over the objection of plaintiff, that the letter of October 10 was the first claim that Coburn & Ewing ever made to him to pay anything, and in this ruling it is asserted that error was committed, for the reason that the right of plaintiff to recover did not depend upon whether Ewing ever demanded such settlement or had a right to demand such settlement.    This evidence, we think, was competent as tending to show how the parties to the contract understood it prior to that time.    It was said in Whitehead v. Bank, 2 W. & S. 175:    "The business of a court and jury is to ascertain the meaning and intention of the parties in making an agreement, and to carry that into effect, if it is consistent with the law.    I know of no better mode of ascertaining this meaning, than is shown if all parties acted on a particular meaning." [St. Louis v. Laclede Gas Light Co., 155 Mo. 1, and authorities cited.]

Plaintiff's land was purchased by Ewing July 7, 1887, and the letter in question was not written until October 10,

1888, fifteen months thereafter, although, in the meantime, Ewing had been hard pressed for money, and unable to meet his payments for the lands as they became due. If the arrangement between the parties was a partnership and so regarded by them, is it not strange that Ewing did not call upon McMillan and Roraback to pay their respective parts before that time? Plaintiff's right to recover is predicated upon the theory that defendants were partners all the while, and any evidence was admissible upon the part of McMillan and Roraback, which tended to show that no such partnership ever existed between them and Ewing.

The same may be said with respect to the assertion by plaintiff that error was committed in admitting in evidence the correspondence between defendants in October, 1888, and the certificate made by Ewing that McMillan had complied with his covenant that the car works would be constructed. They were admissible as tending to show how the parties regarded the contract between them, and the non-existence of a partnership.

The finding of facts was separate and apart from the conclusions of law reached by the court and, as no exceptions were taken and saved to such finding, it stands as a special verdict, or an agreed case; and if the conclusions of·law under the facts so found were correct, the judgment must be affirmed; otherwise, reversed. [Blount v. Spratt, 113 Mo. 48; Freeman v. Moffitt, 119 Mo. 280; Land Company v. Bretz, 125 Mo. 418; Loewen v. Forsee, 137 Mo. 38.]

The plaintiff contends that the court erred in its conclusions of law in several particulars, but, from the view we take of the case, it is entirely unnecessary to pass upon each declaration of law given, or the action of the court in amending some that were asked, and then given as amended, as the result is the test, and if that was in accordance with the facts found and the

law of the case, the judgment must be affirmed.

It is argued that the relations of the parties in and to the agreements mentioned in the first declaration of law, were such as could exist between parties by or for whose benefit real estate was purchased under such circumstances as are described in declaration of law fifteen, which was modified by the court and then given, and if the trial court had properly construed such agreements, it would have given the first declaration of law. And that the effect of the court's ruling was that although plaintiff's land was purchased and held by Ewing pursuant to and subject to said agreements, and though they did not improperly express the intention of the parties, no one had any right, title or interest in or to said land, either legal or equitable, except Ewing; otherwise the court, under the declarations of law given, and the undisputed facts, would have been bound to find for plaintiff.

In order to constitute a partnership there must be "community of interest, a sharing in the profits and losses as such, the existence of mutual relationship of principal and agent, and an intention on the part of the persons interested and uniting in the prosecution of the common enterprise, to become and act as partners. These are the proximate tests as to the existence of a partnership between them; what constitutes a partnership being a question of law for the court; while the question as to the existence of the constituent elements of a partnership is one of fact for the jury." [17 Am. and Eng. Ency. of Law (1 Ed.), 830.]

In 1 Bates on Partnership, section 17, it is said:

"To determine whether the relation between persons constitutes a partnership, their intention in forming it governs. .... The declarations of the parties themselves upon the subject, if not inconsistent with the other terms of the contract, will control. . . . . . The intention of the parties will be deter-

mined from the effect of the whole contract, regardless of special expressions."

In the note to section 19 of Collyer on Partnership, p. 33, (6 Ed.), notes by Wood, it is said: "Whether persons are partners or not is a question of intention, to be decided by a consideration of the whole agreement into which they have entered, and ought not to be made to turn on one or two only of the clauses in it."

It is said: "Notwithstanding these differences of opinion as to the test of mutual agency, it is entirely clear that the old rule that sharing profits as profits made one a partner is overthrown. It seems also to be true that the real test is that . . . . there must be a community of interest—a joining as principals, in carrying on a business for their joint profit. This community of interest as principals in the transactions necessarily excludes . . . . any other class of creditors whose interest is not in the business itself, who have no common ownership of the business, its capital or its stock in trade, who do not own the profits, if there are any, who have no voice or part in controlling the management of the business, but who are simply entitled to be paid out of the profits, if there are any, some claim or demand which they have against the real principals in the business."

In Jernee v. Simonson, 58 N. J. Eq. 282, where one party holds the title to all the property used in the conduct of a business and has the exclusive possession of both the property and the business, as did Ewing in the case at bar, but by an agreement contracts to share profits with another, the agreement does not, in the absence of other proof of an intention to be partners, constitute *inter sese*, a partnership, but that it is only a contract for sharing of profits. [Wild v. Davenport, 48 N. J. L. 129.]

In the case last cited it is said: "To subject a person not ostensibly a partner to liability for partnership debts, there must be some contract to which he is a party with respect to a

communion of profits, which gives him control as principal over the conduct of the business, or creates, as between him and the ostensible partner, the relation of principal and agent."

To the same effect are Coward v. Clanton, 122 Cal. 451; Mayfield v. Turner, 180 Ill. 332; Gibson v. Smith, 31 Neb. 354; Waggoner v. Bank, 43 Neb. 84.

In McDonald v. Matney, 82 Mo. 358, it was held that the mere participation in the profits and loss does not constitute a partnership between the parties so participating, but that is a question of intention on the part of the alleged partners to be determined by the triers of the fact from the circumstances proved.

So in Thompson v. Holden, 117 Mo. 118, it was held that the mere participation by one in the profits arising from the sale of lands does not per se constitute him a partner therein.

In Thompson's case, the case of Ellsworth v. Pomeroy, 26 Ind. 158, is cited, in which it is said: "It is well settled that a contract to share profits between parties does not necessarily create a partnership, as between themselves. It is often merely a mode of ascertaining the compensation of an agent for his services. Nor is there any rule or principle of public policy contravened by an agreement of the agent to indemnify his principal against loss by the business, or to guarantee to him a certain profit in it. In a controversy between the parties or their representatives, as in this case, it is purely a question of intention, to be deduced from the contract itself." The court, after holding that there was no partnership and that Ellsworth had no interest in the property at the time the contract under consideration was executed, proceeds as follows: "Upon the happening of a condition subsequently to be performed by Ellsworth, to-wit, the sale by him of sufficient lands to produce a fund in which he might be entitled to share, it might be that equity would, for his protection, if necessary to relieve him

from the consequences of a refusal by Pomeroy to allow him to go on, lay its hand upon the specific fund, or turn the lands remaining unsold into money, and give to him his portion thereof. But the condition never happened, and never can, the time having expired, and of course the right which depended upon its performance never was called into existence."

In the recent case of Mackie v. Mott, 146 Mo. 230, McDonald v. Matney, supra, was followed, and the doctrine again announced that the formation of a co-partnership is one of intention by all the parties thereto, which must be arrived at from the contract itself and surrounding circumstances.

There is also quoted with approval in that case the following passage from Parsons on Partnership, page 58: "It should be added, that whether two or more persons are partners *as to each other,* must generally, and perhaps always, be determined by the intention of the parties, as the same is expressed in the words of their contract, or may be gathered *from the acts and from all the circumstances* which are available for the interpretations or construction of the contract."

Is there then anything in the facts found by the court, which must be considered as correct, because no exception was taken thereto, which shows an intention upon the part of Ewing, McMillan and Roraback to enter into a co-partnership, or from which such intention could be inferred? Certain it is that there is nothing in the contract indicating such a purpose save and except the agreement to participate in the profits arising from the sale of the lands bought by Ewing upon his own account after paying back to him the purchase money without interest, expenses attending the purchases, and the taxes paid by him on the land, and this did not constitute a partnership. The provisions of the original contract, relating to the keeping of books of account by Ewing, had no tendency whatever as showing that there existed a partnership between the parties.

It was simply a matter of business in order that it might be definitely ascertained by McMillan and Roraback when Ewing had sold a sufficient amount of the land, to repay him the amount of money to be refunded him under the contract before McMillan and Roraback were entitled to anything from sales of the land thereafter to be made. And the sending of the trial balances to McMillan and their examination by Roraback were evidently for the same purpose.

In Holmes v. Railroad, 5 Gray 58, the Old Colony Railroad Company owned a hotel which it leased to Parker & Tibon for which they were to pay $500 annually and one-half the profits. Books were to be kept open to the inspection of the railroad company. And it was held that the agreement to keep exact accounts of all receipts and expenditures, which should be open to the inspection of the corporation, was a proper arrangement to carry out the fulfillment of the stipulation to pay one-half of the net proceeds arising from keeping the house for rent of the same, and did not necessarily import any partnership in the proceeds thus received by Parker & Tibon.

In Warwick v. Stockton, 55 N. J. Eq. 65, it was sought to show that a partnership existed between the plaintiff and defendant where the latter sold his inventions to the former who furnished the capital and managed the concern, the plaintiff having the right to inspect the books which defendant agreed to keep, the profits to be divided equally. It was held that the express provision in the contract for access by plaintiff to the books of account indicated that it was not contemplated that he should have an active share and voice in the everyday management of affairs; and that such a participation in the business would necessarily give constant access to the books, and no special provision therefor would be necessary.

This provision in the contract is consistent with the theory that there was no partnership, and inconsistent with the theory

of partnership, because any member of a co-partnership has the right as such to inspect the books of the firm, and his right to do so does not depend upon contract. [Bradley v. Ely, 56 N. E. 44; Jernee v. Simonson, supra.]

Among the cases relied upon by plaintiff, as holding that under the facts and circumstances disclosed by the record in this case defendants were partners, is Wetmore v. Crouch, 150 Mo. 671, but there is nothing said in that case which is not in perfect accord with what we have said in this.

The case of Tyler v. Waddingham, 58 Conn. 375, is another case relied upon by plaintiff, but in that case Waddingham was to furnish the money with which Kimberly was to buy options. Waddingham was to organize a corporation to which the lands should be conveyed at an advance; he to have two-thirds of the profits and Kimberly one-third. Waddingham caused Kimberly to convey the lands to the corporation, and gave him an instrument of writing showing that he was entitled to one-third interest in the profits. Before the contract for the sale of the lands out of which the litigation arose was made, the plaintiff was advised that Waddingham was entered in the enterprise and the sale was made on the faith thereof. It was held that they were partners. But in that case Waddingham furnished the money to buy the land, organized the corporation to which the lands were conveyed by Kimberly according to contract when Waddingham gave him a writing showing that he was to have one-third interest in the profits, and before the sale of the land involved in that litigation was made, plaintiff was advised that Waddingham was interested in the venture, and the sale of the land to recover the purchase money for which the suit was prosecuted was made upon the faith thereof.

In the case at bar, neither McMillan nor Roraback was to furnish any money for the purchase of the lands nor were they

to have anything to do with the disposition of them. They were not known in them, and were not to have any interest in them under the contract until after the purchase price, costs attending the same and the taxes thereon were paid. The facts in the two cases are so different that the Connecticut case can not be considered as an authority in this.

Beauregard v. Case, 91 U. S. 134, is another case relied upon by plaintiff. But that case is clearly distinguishable from this. There was a distinct agreement to share the losses in that case. The partnership was made to commence from "the date of the lease" of the railroad, and Beauregard was to "take charge, conduct, manage and direct the undertaking" in the matter of the lease of the road. In the case at bar, there is no agreement to share the losses, and if there was to be a co-partnership, its beginning dates from a period after Ewing should be reimbursed for all moneys paid out by him on account of the lands. And instead of McMillan and Roraback taking charge of the land, they were to have nothing whatever to do with it until after Ewing had been reimbursed. But in that case the court held that "the agreement in fixing the commencement of the partnership determined the date of their joint liability." Under this ruling the joint liability of McMillan and Roraback, did not begin until after Ewing was reimbursed for the money paid out by him on account of the land, because their partnership commenced at that time and not before. [1 Lindley on Partnership, *27.]

In Blair v. Shaeffer, 33 Federal Reporter, 218, the parties entered into a contract whereby the plaintiff was to furnish the money, and the defendant was to obtain the title to the property in his own name, and manage it for a fixed compensation of five per cent commission on sales, for their mutual benefit. As to the profits, the contract further provided that when enough land had been sold to repay the plaintiff all the money

he had advanced, with interest, then the remainder of the property should belong, sixty per cent to the plaintiff, and forty per cent to the defendant, or if the remainder of the property was converted into money, then the proceeds should belong, sixty per cent to the plaintiff, and forty per cent to the defendant. The contract also provided that it might be deemed advisable to obtain certain releases "for the mutual interest of said Blair and Shaeffer." It was held that the contract did not create a partnership between the parties. In speaking of the case of Beauregard v. Case, supra, the court said: "There is a very clear distinction between that case and this. It is true, in that case as in this, that one party was to furnish the money, and the other to obtain the title to the property in his own name, and manage it for a fixed compensation for their mutual benefit; but in that, the contract expressly provided that the parties should share in both the gains and losses, and also named the relationship a partnership and provided for a continuance thereof in case of the death of one of the parties. The intention of the parties was thus clearly expressed." Later on in the opinion it is said: "It is true, as urged by counsel for defendant, that in one place is found this expression: 'It is further agreed for the mutual interest of said Blair and Shaeffer;' but this is perfectly consistent with the non-existence of a partnership, for Shaeffer was interested by reason of his share in the profits, as well as Blair, in anything which increased the value of the land or tended to facilitate sales." So in the case in hand, the purchases of the lands to be made by Ewing were for the mutual benefit of himself, McMillan and Roraback, because they were all jointly interested in the profits to be derived from their sale, hence, McMillan and Roraback were interested "in anything which increased the value of the land or tended to facilitate sales." While that case was reversed on appeal by the Supreme Court of the United States, 149 U. S. 248, it was not upon the ground

that no partnership existed between Blair and Shaeffer by the contract between them. Upon this question Mr. Justice GRAY, in speaking for the court, said: "There may doubtless be a partnership in the purchase and resale of lands, as of any other property. But this contract contains no expression to indicate an intention of the parties to become partners. It does not authorize either party, without the consent of the other, to sell any property, or to contract any debts, on behalf of both. If the enterprise proves unsuccessful, the contract does not provide or contemplate that Shaeffer shall share the loss. . . . . There is great difficulty, therefore, in the way of construing this contract as creating a partnership between Blair and Shaeffer."

Our conclusion is, under the facts as found by the trial court, the written contracts between the parties, and their relations and conduct towards each other, that there never at any time existed a partnership between them to purchase lands in Clay county.

The conclusion reached renders it unnecessary to pass upon other questions discussed in the oral argument of the case and by counsel in their briefs.

The judgment is affirmed. *Sherwood, P. J.,* and *Gantt, J.,* concur.