JOHN E. REYNOLDS, Respondent, v. AL. G. BARNES AMUSEMENT COMPANY, a Corporation, Appellant.

In the Kansas City Court of Appeals, June 11, 1923.

1. **NEGLIGENCE: PROOF:** Where Several Specifications of Negligence are Alleged, it is not Necessary to Prove All of Them, But at Least One Sufficient to Cause the Injury Must be Proved. Although

Reynolds v. Barnes Amusement Co.

a petition may allege several specifications of negligence, it is not necessary to prove all of them, but at least one specification of negligence sufficient to cause the injury must be proved.

2. ———: Master and Servant: Demurrer: Upon Demurrer Proof of Several Specifications of Negligence Alleged in Petition, Held to Have Combined to Cause the Injury to Plaintiff. In an action by plaintiff, a circus employee, for injuries received as result of stepping into a hole caused by the removal of a tent stake, where it was urged that the demurrer to the evidence should have been sustained, it is *held*, that the allegations in the petition that defendant, and its agents in charge of the work of taking down tents negligently and in violation of custom, left open holes in the ground, failed to provide reasonably sufficient light where plaintiff was required to work and failed, after plaintiff's injury, to procure prompt medical attention, combined to bring about the injuries for which plaintiff sued.

3. ———: ———: ———: Held That Demurrer Should not Have Been Sustained Because the Way Plaintiff Claimed to Have Received His Injuries was Contrary to Physical Laws. Where circus employee sought to recover damages as result of stepping into a stake hole made and left uncovered by defendant, although it was the custom to fill and cover all holes made by removal of tent stakes, causing plaintiff to break his leg, it is *held* that the demurrer should not have been sustained because the way in which plaintiff claimed to have received his injury was contrary to physical laws.

4. ———: ———: Where it was Custom of Master to Cover Tent Stake Holes, not Necessary to Liability to Show That Hole Existed a Sufficient Length of Time to Give Notice of its Existence. Where it was conceded that it was the custom for a circus owner to immediately fill and cover all holes made by removal of tent stakes, the owner was liable to an employee injured because of negligence in failing to cover stake hole into which he stepped, and it was not necessary in order to make a case of liability that the hole should have existed a sufficient length of time to have given notice of its existence.

5. INSTRUCTION: Broadening Issues: An Instruction Permitting Recovery on Finding Plaintiff was Injured by Stepping into a Stake Hole on Circus Grounds, Where Evidence Showed That Hole Causing the Injury was a Menagerie Tent Stake Hole and That There Were Other Holes on the Premises, not Made by Defendant, Held Broader Than Case Made by the Evidence under the Petition. Where petition alleged that plaintiff stepped into a hole which had been left in the ground by the removal of a tent stake by one of defendant's

employees under the superintendence of their superiors, in their work of taking down tents and the evidence showed that the hole that caused the injury to plaintiff was a menagerie tent stake hole, an instruction not submitting the case upon the existence of that particular hole, there being evidence of other holes which were not created by defendant, and permitting recovery if plaintiff stepped into any stake hole on the premises produced by withdrawal of a tent stake, *held* erroneous as being broader than the case made by the evidence under the petition.

6. ————: **An Instruction Permitting Recovery for Injury Received by Stepping into Open Stake Hole, Where There was no Evidence of its Prior Existence to Charge Defendant with Knowledge, and it was not Shown That the Hole was Negligently Created by Defendant, Held Erroneous.** In an action to recover damages for personal injuries to a circus employee, where petition alleged he stepped into a certain stake hole left uncovered by defendant, an instruction permitting recovery if plaintiff was injured by stepping into any stake hole on premises, was erroneous where location of the hole was important because of the necessity of its being where plaintiff was ordered to work, because of the issue as to whether that place was sufficiently lighted, and the cause of the hole was material, since there was no evidence of its prior existence sufficient to charge defendant with knowledge thereof and hence a hole caused by the removal of a stake in any other manner than that alleged in the petition, or any open hole which was not negligently created by defendant would not render defendant liable.

7. ————: **An Instruction Held not Cured by a Clause Therein Requiring Knowedge of the Existence of a Hole Where There was no Evidence to Justify the Inclusion of Such a Clause.** An instruction not limiting recovery to finding of the existence of the specific hole alleged in the petition and shown by the evidence, was not cured by a clause in the instruction requiring defendant to have known of the existence thereof where there was no evidence to justify the inclusion of such a clause.

8. ————: **Concurring Negligence: Separate Causes of Action: Where a Single Cause of Action was Stated in Petition, it was Error for Plaintiff by Instructions, to Submit His Case as Two Separate and Distinct Causes of Action.** Where a circus employee's petition alleged that he was injured by the negligence of his master, and that after he was injured the master negligently failed to furnish aid or emergency treatment to plaintiff, when defendant knew of his helpless condition, whereby he was damaged in a certain sum, an instruction submitting the issue of failure to take proper care of plaintiff after the injury and permitting a separate recovery

therefor, when plaintiff had also submitted the issue of negligence in causing his injury by another instruction, the instruction submitting issue of failure to take proper care of plaintiff after his injury, was erroneous as submitting another separate and distinct cause of action for actual damages, the petition stating a case for actual damages as a whole, and because it in effect permitted jury to award actual damages for what petition claimed as a whole and to then allow still further damages for the neglect of plaintiff after he was hurt, in the nature of punitive damages, without requiring jury to find that such neglect was "wanton, brutal and malicious," and plaintiff by thus submitting his case on the two instructions, sought to recover upon two separate and distinct causes of action.

Appeal from the Circuit Court of Jackson County.—*Hon. Nelson E. Johnson*, Judge.

REVERSED AND REMANDED.

*W. W. Holloway* and *Atwood, Wickersham, Hill, Levis & Chilcott* for respondent.

*Frank M. Lowe* and *Richard Busteed* for appellant.

TRIMBLE, P. J.—The defendant owns and exhibits a traveling circus. Plaintiff claims he was an employee thereof engaged in carrying seats out of one of its tents preparatory to defendant's removal from its show site in Kansas City to its next stand or place of exhibition, and that while doing that work he stepped into a stake hole and broke his leg. He brought this suit, based on negligence and also wanton, brutal and malicious failure to thereafter care for and aid him, and prayed for $25,000 actual and $25,000 exemplary or punitive damages. Defendant demurred to the evidence at the close of plaintiff's case in chief and also at the end of the entire case. Both of said demurrers were overruled and the case was submitted to the jury. It returned a verdict wherein it was stated that the jury found for plaintiff "under instruction One, covering the necessary, direct and exclusive results of stepping into the hole"

and assessed "his said damages" at $3000; and that they also found for plaintiff "under instruction Two, covering the question of inattention" and assessed "his said damages" at $4000, making a total of $7000. Defendant appealed from the judgment rendered thereon.

The petition was in one count, and after stating that defendant was a corporation owning and exhibiting trained animal shows and circuses throughout the United States, using large tents, in connection with the erection and staying of which large stakes were driven into the ground, it set up that:

"On or about August 20, 1918, while defendant with one of its said shows or circuses was giving an exhibition in Kansas City, Missouri, and while plaintiff was an employee of defendant and was working in the scope of said employment; namely, carrying seats out of one of defendant's tents to wagons of defendant, which were to haul them, plaintiff stepped into a hole which had been left in the ground by the removal of one of defendant's said tent stakes by defendant's employees under the superintendence of their superiors, in their work of taking down said tents, and as a result of stepping into said hole at said time and place, plaintiff's leg was broken and he was otherwise injured as hereinafter set out. Plaintiff states that it was nighttime and was dark at said time and place."

In reference to the above injury the petition alleged that—"defendant carelessly and negligently failed to provide plaintiff with a reasonably safe place to do the work assigned to him by his superiors over him; that defendant carelessly and negligently failed at said time and place to provide reasonably sufficient light to enable plaintiff and other employees of defendant to perform their work and duties with reasonable safety to themselves; that defendant, its agents and servants carelessly and negligently caused said hole in the ground, at said time and place and permitted said hole to remain open and uncovered; and plaintiff states that it is and was at

said time, customary among employees engaged in business the same or similar to that of defendant to provide light, and a liberal amount of it, at places where there was work being done such as plaintiff was engaged in at said time and place for defendant; that it is and was at the time of plaintiff's injury, customary for people engaged in said kind of business not to leave open holes in the ground as was done in the instance herein set out; and that said customs and practices were of long standing and were well known to defendant, and plaintiff knew of said practices and customs and at all times relied on their observance by defendant, its agents and servants.''

The petition also alleged that after plaintiff's injury in the manner hereinabove set out—''he was permitted, with the knowledge of defendant, its servants and agents, to lie on the ground without any medical or surgical attention for an unreasonable length of time; that he was then carried by some of defendant's servants and put upon a railroad flat car where he was permitted to lie for the remainder of the night and part of the next day without any nursing or medical or surgical attention whatever, all with the knowledge of defendant; and that finally he was taken off said car and laid upon the ground at a place to which defendant's show had traveled after completing its said exhibition in Kansas City, all of said acts and omissions after plaintiff's said injury being with the knowledge of defendant, its superintending agents and servants, and with the knowledge on the part of defendant, its superintending agents and servants, of plaintiff's helpless and crippled condition. Plaintiff states that after lying for a further period of time he was found by strangers who saw his helpless and deplorable condition and caused him to be taken where he could be given necessary attention.'' And that—''defendant, although knowing plaintiff's injured and helpless condition, carelessly and negligently failed to give or procure or provide any medical and surgical attention for him and caused and permitted plaintiff to

Reynolds v. Barnes Amusement Co.

be hauled in said manner on said flat car and to be neglected and mistreated."

The petition then went on to allege that—"as a direct result of each and all of the careless and negligent acts and omissions of defendant as herein complained of, his left leg and the bones, muscles, tendons, nerves, blood vessel and tissues thereof were broken, bruised, contused and lacerated and he was caused to suffer excruciating pain and mental anguish as a result of his injury and his having no medical or surgical attention for so long a time. His left knee and the tissues thereof were bruised, torn, wrenched and injured, causing said knee to be permanently stiff so that plaintiff does not now, and will never, have the normal use of it; his said left leg has been left shorter by several inches than it was before said injury; proper setting and healing of the broken bone in said leg was made impossible by its failure to receive attention sooner and plaintiff had been compelled to undergo several operations on account of said injury. His back was severely bruised and wrenched and he suffered injury to his kidneys and the functions thereof have been impaired; his nerves and entire nervous system have been greatly shocked and injured and he was caused to suffer from nervousness, sleeplessness, loss of appetite and loss of weight. Plaintiff's leg where said bone was broken is still unhealed and during said operations pieces of dead and decayed bone have been removed therefrom; and plaintiff states that all of said injuries are permanent and lasting in their character and effect. Plaintiff has been unable to work and earn money since the said date of his injury and his power and ability to perform labor and earn money and a livelihood has been permanently impaired and destroyed."

The petition then alleged that as a result of his said injury, plaintiff had been compelled to obligate himself for hospital bills in the sum of $1500, medical and surgical bills to the amount of $550, and plaintiff had lost $3000 in wages all to his "damage as a whole" in the sum of $25,000.

The petition then went on to still further allege that: "The said defendant's, its superintending agents' and servants' neglect of him and failure to procure and provide medical and surgical attention for him after his said injury as herein set out, was wanton, brutal and malicious, that it was without excuse and was caused and permitted with the knowledge of defendant and was in brutal disregard of the dictates of law and humanity; and plaintiff claims punitive or exemplary damages in the sum of twenty-five thousand dollars ($25,000)"

The answer, after a general denial, set up that—"whatever injury, if any, plaintiff received at the time and place alleged in his amended petition filed herein, was due to and occasioned by his own carelessness and negligence in stepping into the hole alleged in plaintiff's petition, if he did step into such hole and not looking out for and avoiding stepping into said hole, if there was such hole." And that—"plaintiff was familiar with all his surroundings and the condition under which he was performing the alleged work or services at the time and place of his alleged injury, if he was performing any work or service for defendant at said time and place, and whatever risk or danger there was to plaintiff in performing the said alleged work or service in which he was engaged at the time and place of his alleged injury, if he was engaged in any work or services for defendant at said time and place, was open and obvious, known to and appreciated by him, and plaintiff assumed whatever risk or danger there was to him in performing said work or services, if any, at the time and place alleged."

The reply was a general denial.

Plaintiff testified that he had had twenty years' experience in working around shows, having been with ten different shows in the various capacities of Trainmaster, Treasurer, Assistant Boss and Canvas-man; that in August, 1918, he was thirty-seven or thirty-eight years old, and for three weeks prior to his entering the employ of

defendant, he had been working at the stable of the Wells-Fargo & Company in Kansas City.

The defendant's circus came to Kansas City on Sunday, August 18, 1918, and plaintiff says that late that day he went out to the circus grounds, but found the tents all up, and made no application for work and said nothing to anyone about getting work.

He testified that about nine o'clock Monday morning he went back to the circus grounds and was hired as a general laborer by the boss canvas-man, a man he said was called "Perley," and by whom he was put to work. He says he had seen the man called Perley and knew him by that name in another show. Plaintiff says he was first put to work "leveling seats" and after that he "guyed out," that is, went around tightening up the tent ropes where they had gotten slack; that he spent Monday night on the grounds with the other men, and slept on the tail gate of a wagon; that on Tuesday he continued the work of "guying out" by going around to the stakes and tightening the ropes, and also helped to straighten up some wagons.

The circus showed in Kansas City on Monday and Tuesday, and after the performance Tuesday night, defendant was to leave for its next stand which was in Armourdale, Kansas. The two principal tents in the circus were the "menagerie," the tent wherein the caged wild animals were displayed, and the main tent or "big top" where the circus rings were and the performance was given.

Plaintiff testified that on Tuesday night about ten o'clock, after the menagerie tent was down and the stakes thereof had been pulled, the side of the "big top" next to some seats that were unoccupied was raised so the men could walk in and carry out the extra reserved seats, and plaintiff in company with others, forming a gang of eighteen or twenty men, and acting under the direction of the man "Perley," one of defendant's bosses or supervisors, was by him ordered to carry these extra reserve

seats out of the "big top" to a wagon on the grounds; that plaintiff began carrying out these seats, and had made three or four trips and was returning to the tent for another load when he stepped into a stake hole and fell, breaking his left leg in the upper third of the femur; that his foot went into the hole, as near as he could judge, about sixteen or eighteen inches, or nearly to the knee; that he tried to get up but could not do so; that there were no lights thereabout or near the hole and it was dark, hence he did not see it; that when he fell he felt down with his hand and by feeling discovered that it was a stake hole and felt the muddy ground which had been pulled up with the stake as it had been withdrawn; that the hole seemed to be probably fourteen inches in size at the top; that his foot seemed to come out of the hole when he fell, he couldn't say whether he pulled it out or not, but at any rate the ground was soft and his foot came out; that he wore a number nine shoe and weighed 220 pounds; that he fell on his side; that when he found he couldn't get up he called to one of the men and told him to tell the boss canvas-man Perley "I can't get up, my leg is broke;" that the men went away and in three or four minutes came back with three more men and picking plaintiff up, carried him over and laid him down beside a wagon, the men that carried him being men who had been helping to carry out seats; that the place where he was laid was about ten feet from the "stake and chain" wagon; that while lying there he lost consciousness and did not know how long he lay there, but when he returned to consciousness a man who said he was the show detective had his foot on him and shoving him and told him to get up. Plaintiff says he told him he couldn't as his leg was broken and asked the man to "Do something for me, get me a doctor or take me over to the car, do something for me;" that the man went over to the flat cars and got some men, who load the trains and are called "razorbacks," and they carried him over and laid him on a circus flat car under a wagon.

Plaintiff said he then lost consciousness again and did not come to himself again until the next morning and then the car was in Armourdale and was being unloaded; that the razorbacks carried him off the car and laid him on the ground beside the tracks; that afterwards one of the men who worked around the stake and chain wagon, a "dutchman," came by, and plaintiff asked him to tell the circus people to get a doctor, he was in "terrible misery;" that the man said, "All right" and went away, but no one came until after he had laid there about three hours, and somewhere about seven o'clock, a stranger saw him and afterwards an ambulance came and took him first to the defendant's circus grounds in Armourdale where a man, whom he did not know, got in the ambulance with a book and asked plaintiff his name and how long he had been with the show. (Plaintiff proved by witness Gilbert, a police chauffeur of the Police Department of Kansas City, Kansas, that he drove the ambulance on this occasion; that when they got to the circus grounds he called for the manager or boss, and a man who was giving orders to the circus men working there and who said he was the boss, came and got into the ambulance, talked to plaintiff, took his name and told witness to take plaintiff to Bethany Hospital and they would pay the bill; that he, the chauffeur, was called by some woman over the telephone and notified of plaintiff's lying hurt beside the tracks. Witness, after giving this testimony, was taken to the witness room where defendant's witnesses were, and pointed out a man who very much resembled the man who got into the ambulance, he wouldn't say positively that he was the same man, but said that he "looks like the one."

Plaintiff, and also the above police chauffeur, testified that the former was taken thence to Bethany Hospital and left there. At that time his leg was "terribly swollen, stiff, and a great deal larger than normal size."

At the hospital plaintiff's leg was set and put into a cast and he was put in a ward where he remained until

214 M. A.—26

an operation was performed by making an incision in the leg to the bone and wiring the broken places together. He was then put in bed where he remained for something over nine months and then a second operation was performed. He was in the hospital for about twenty months when he was put to work therein making dressings so that he might have something to do and keep his mind occupied; afterward when he could walk on crutches or a crutch and a cane he was put to running the elevator in the hospital at $20 per month and board. He is still in the hospital running the elevator, getting $30 per month and board. He has to use a crutch and a cane. His knee is stiff and he cannot bend it. His crippled condition is permanent.

The plaintiff reached the hospital about noon the day after he was hurt. According to the medical testimony, at the time he reached the hospital plaintiff's leg was swollen to twice its normal size, and the record shows he was a large man; his leg was set, a cast put around it and, with him in bed, an extension weight of ten pounds was suspended to his leg so that the two, the cast and the weight, would hold the broken fragments together. He was in bed thus for about three weeks. Then it was found, by moving the leg, that the bones had not united at the fracture, and the surgeon decided to administer an anaesthetic, cut into the leg to the bone and wire the broken pieces together. The surgeon cut into the leg, making an incision about six or eight inches long, and found that the muscles and tendons and coverings of the muscles had been lacerated and injured by the "spiculas of bone, which happened to be very sharp in this case," and this had caused a great deal of adhesion; that when muscles are injured, especially the sheath or covering in which they move, or when two raw surfaces are thus against each other, they will adhere and grow together, and this will produce stiffness; that the break was not a direct but an oblique break, broken lengthwise of the bone so that there were sharp ends and sharp edges

at the end of each bone, "which had done in my opinion a great deal of harm and injury the first twenty-four to forty-eight hours;" that at the time the doctor performed this operation he found that a great deal of cartilage or bone material had been thrown out at the end of each bone and these he had to saw off in order to make new edges of bone there and this necessarily causing a shortening of the leg but it had to be done. He then placed the ends of the broken bone in proper place with reference to each other, put wires about the same and inserted two drainage tubes, sewed the incision up and put the leg in a cast and put on the extension. During the year that followed, the suppuration was extensive, the wound discharged continuously, and in about eight or nine months after the first operation the surgeon performed another operation which consisted of removing the wires which is often necessary in such cases. The evidence is that considering the harm that was done in the first twenty-four hours, the oblique nature of the fracture and the sharp points of bone, the doctor said he got a pretty good "apposition" of the bones; and an X-ray picture of the leg showing the bone was introduced; but there was only a partial union of the bone and the doctor doubted that plaintiff would ever be able to walk without his cane or crutches. He, in answer to an hypothetical question, gave it as his opinion that the long existing period between the time of plaintiff's injury and his arrival at the hospital in which plaintiff was without attention, and the movements through which he went, could cause the laceration of and injury to the muscles.

There was ample evidence, and indeed it was conceded, that it was the custom for all working places about a circus to be lighted, for a light to be on every wagon being loaded and for all holes made to be filled up or covered over and for none to be left open; also that it was the custom when anyone got hurt to give him immediate attention.

Plaintiff says, and so do defendant's witnesses, that there was no hole there during the daytime on Monday or Tuesday. Plaintiff said he was not familiar enough with the grounds to specify on defendant's plat where the wagon was located and did not do so, but said that the seats had to be carried fifty feet or so at the "furtherest part" and twenty-five to thirty feet "from the time you came out there until you walked down to this wagon." Plaintiff denied that the wagon was located close up to the side of the big tent, but said that it seemed to him the wagon was down close to where the menagerie tent had been.

As heretofore stated, plaintiff testified that at the time he and the gang of men went to work carrying out the seats, the menagerie tent was down and the stakes had been pulled. Plaintiff said that by feeling he felt the "ground muddy where this stake had been pulled up;" that it must have been pulled up Tuesday night; that while he could not say what that particular stake was for, yet it was a menagerie stake and "must have been used around the menagerie for some purpose;" the hole was "not very far" from the wagon, but plaintiff could not say how far; it was a stake hole made by the defendant, "it could not be made by anybody else;" that the hole was a stake hole around the menagerie; that the stakes around the menagerie tent were wooden stakes, plaintiff had been around tightening up the ropes and he had helped pull up the menagerie stakes on the other side of the menagerie tent; that he had seen stake holes, made by pulling up a stake, large enough to let a number nine shoe down into it; that the stakes were pulled by a stake puller, and that sometimes a wooden stake, especially one with the bark still on, would pull up the ground around it as it came up and these stakes were from two and one-half to three inches in diameter; that the men carrying the seats walked in a hurry, and, to keep from getting in each other's way, they scattered out and did not traverse the same path each time they went and to and fro to the wagon.

Defendant took the position at the trial that plaintiff never worked for defendant, and that there was no hole.

As to whether plaintiff worked for defendant or not, plaintiff was not asked nor did he say anything about the terms of his employment. He does not seem to have been entered on the pay-roll. Plaintiff says he got no lunch on Monday but that evening a stake and chain man called "Peggy" took him over to the cook-tent where he got his supper; that it is not always the custom to allow no one without a card into the cook-house, and though in some shows one must get a card before he can be admitted to the meal-tent, yet sometimes the boss will tell one of the men to take such-and-such a one to eat and in those instances no ticket is given; that the stake· and chain man, Peggy, took him to breakfast and likewise at noon and at night Tuesday; that he never was given a meal ticket, but that the boss, called "Perley," put him to work and it was he who told him to carry out the seats, and·Perley stood at the end of the extra reserve seats watching the men as they carried them out.

The defendant did not call, nor was any reason or excuse shown for not calling, any of the eighteen or twenty men who were in the gang carrying seats out at the time plaintiff says he was hurt. The record also shows that the deposition of four employees of the show were taken by defendant but were not offered in evidence.

Defendant introduced the evidence of Petterson who claimed that at the time of the taking of his deposition he was "twenty-four hour agent," i. e., the man who arrives in town twenty-four hours ahead of the show and makes the necessary arrangements with the railroads, street railways, and street authorities; that he had also acted as "Purchasing Agent" and Superintendent; that in the latter capacity he laid out the grounds and superintended the erection of the necessary tents; that on August 18, 19 and 20, 1918, he was the defendant's "purchasing agent;" that the "general agent" of the show

made the arrangements to show at the place it did in Kansas City on those dates; that he, the witness, visited the grounds Sunday, Monday and Tuesday; that he went over the entire grounds both before and after the tents were erected.

He testified that on Monday the grounds were "in good condition with the exception of being moist;" that on Tuesday the grounds were in "practically the same condition;" that "it rained Monday *and Tuesday,*" and the soil "was moist and soft, clay like."

He testified that the "menagerie" tent and the "big top" tent were parallel and about twelve feet apart; both facing north; that in the rear and between these two tents he had occasion to "go over that ground after they were put up" and he examined it thoroughly to see that there were "no bad holes in the grounds to hurt the horses or employees of the show" and that there were "none such at that time;" that it was impossible for a hole to have been there sufficiently large for a man to have got his foot into it and be thrown down, and he not have seen it; that the custom was to see that there were no holes in the ground, and to report accidents immediately; that no accident was reported; that there was plenty of light and that the condition as to lights on these two nights was very good.

He further testified that the *only kind of stakes* used on the menagerie tent were *iron* stakes about an inch and a half in diameter made of steel truss rods from railroad cars; that when they were withdrawn from the ground the largest hole they would leave was one the size of the stake itself; that when wooden stakes were used the average was two and one-half inches in diameter and the largest he had ever known to be used was four inches in diameter.

On cross-examination he stated that no wooden stakes at all were used on that particular ground in that particular city; that on the night the show moves, the menagerie tent is taken down some time before the big

tent; that the ground was "moist and soft on top and underneath it was hard and rocky;" that stakes were driven in from a foot and a half to two feet in the ground; that in this particular ground a stake would not "weave" back and forth and make a much larger hole; that he was superintending the loading himself and that no lights were taken down when the menagerie tent was taken down. When asked if he were "superintending the loading of this particular wagon", he said, "Yes, sir," but that nobody got hurt there at that time; that Harry Williams reported there "was a drunken man laying over on the other side of the big top;" that all of the wagons had to be loaded at different times during the night and "this particular wagon would be loaded anywhere from 9:35 to 10 o'clock;" that Harry Williams was a colored man whom he had last seen in San Francisco, he did not know his whereabouts or his home except that it was somewhere in Arkansas; that Williams reported to him "there is a drunken fellow laying over near the chain wagon; I wish you would come over and see and take him out of our way; he is in the road;" that witness went to where the drunken may lay and asked him what he was doing there and the man asked him who he was, and thereupon the witness smelled his breath and found "he was drunk, so I left him there;" that the man never told him he was hurt or that his leg was broken and he never saw him again and did not know what became of him.

On redirect examination he testified that the lights in the big tent where the performance was going on could come out the side where it was raised and would light up the ground in question.

With reference to the man Petterson, defendant's witness Thompson, who was the show's police officer, and who says he was there as the "officer with the show" all the time it was in Kansas City, said on cross-examination that he did not know Petterson; and defendant's witness Smedley, defendant's general utility man, said he

never heard of Petterson, but had heard of Patterson, but that no one by that name was in charge of the work, but that two men Harrison and Beckett were in charge. Neither of these two men were placed on the stand or accounted for, though the record shows that Harrison was present at the trial and was reading aloud to defendant's witnesses in the hall their depositions before they testified.

Defendant called nine witnesses in all, Margaret Thompson, a woman wild animal trainer, Petterson, Thornton, the equestrain director, King, a horse trainer, Hauser, the boss canvas-man, Smedley, Thompson, the show officer, Anderson, the weather bureau man, and Bigsby, Superintendent of all canvas. Of these, those that claimed to have any knowledge of the facts denied that plaintiff was employed, or that there was a stake hole or that he was hurt.

When plaintiff testified that he was employed by "Perley," a boss canvas-man," defendant's counsel said to him, "Dont you know there is not any such man and that is not his name and there was not anyone connected with the show named Perley?" To which plaintiff replied, "Well, that is his name; he is boss canvas-man." and later testified he saw the man in attendance at the trial. During the cross-examination of Hauser, defendant's witness and its boss canvas-man, he admitted that "Perley" was his nickname and that he was generally known among the employees by that name. And Hauser was the man that the Police Chauffeur said resembled "very much" the man who talked to plaintiff in the ambulance and directed him to be taken to Bethany Hospital.

Hauser testified that if the reserve seats on the end were not needed they were taken down while the performance in the "big top" was going on, the canvas forming the side of the tent at that place being raised and the seats would be carried out to the wagon only about twelve feet away; that the "stake and chain wagon" was

his headquarters and it was light there and he saw no man lying there or thereabout on that night and his duties required him to go to that wagon frequently. Bigsby testified that if a man had been lying over by the stake and chain wagon he would have seen him.

As heretofore noted, defendant's witness Petterson said that only iron stakes made from steel truss rods were used, and Thornton said the only stakes used on the menagerie tent were Ford axles which, when withdrawn, left a hole about an inch in diameter, and Thompson the show officer said only iron stakes were used on the menagerie tent but that wooden stakes were used on the "big top." The superintendent testified that "in very hard ground we use iron stakes" and that iron stakes were used on the menagerie tent.

One of defendant's witnesses who testified to the location of stakes, lights, tents, etc., admitted on cross-examination that he didn't have any particular recollection about this particular night in Kansas City as to where things were located, but that his answers were based on what was the usual and customary way of doing those things, and not on any particular recollection as to what was done that particular night; that while they sometimes varied from their regular custom, like the carrying of seats out the back entrance, that wasn't done a half dozen times a season because the wagons were in their places, and while he didn't remember whether the wagons were in their places on that night, yet if they had been elsewhere it would have made an impression on his mind, and as the performance was going on, the only way they could take the seats out was to raise the side wall right behind the wagon.

It is urged that the demurrers to the evidence should have been sustained. If we understand defendant's first contention in this regard, it is that since the petition alleged that his injuries were the 'direct result of *each and all* of the careless and negligent acts and omissions of defendant as herein complained of,'' then there must

be direct, express and positive evidence that *all* of the specific acts of negligence combined to produce the injury. What were the negligent acts and omissions complained of? The petition alleged that plaintiff "stepped into a hole which had been left in the ground by the removal of one of defendant's employees under the superintendence of their superiors in their work of taking down said tents," whereby his leg was broken and he was otherwise injured as thereinafter set out, and defendant negligently failed to provide plaintiff with a reasonably safe place to work; that it was the custom to provide a liberal amount of light at places where work was being done, and it was customary not to leave open holes in the ground, both of which customs were well known to plaintiff and defendant; that defendant negligently failed to provide reasonably sufficient light; and that it was dark; that plaintiff was negligently permitted to lie on the ground without medical attention, and defendant failed to procure surgical aid but permitted him to be neglected. It would seem that the failure to have sufficient light and the leaving of a hole unfilled when it was the custom to have light and to fill all holes, would *combine* to bring about the breaking of plaintiff's leg though the ultimate and principal cause of the injury was the leaving of the unfilled hole. Although a petition may allege several specifications of negligence, it is not necessary to prove all of them, but at least one specification of negligence sufficient to cause the injury must be proved. [Meeker v. Union, etc., Power Co., 216 S. W. 923, 931.] However, there was evidence of all the above-mentioned charges, and the jury could well say that they all combined to help bring it about. It is true, no one affirmatively and expressly testified to seeing this particular hole made by the pulling of a particular stake under the superintendence of any of the superiors, but the evidence is that the menagerie tent was down, its stakes had been pulled, no hole was there before that, the pulling of the stakes and the taking down of the

menagerie tent was done under direction of the supervisors, the stake hole was that of a menagerie tent stake, and from these facts the jury could find that it was a hole left in the ground by the removal of one of the menagerie tent stakes in the taking down of said tent. The failure and neglect to provide medical aid may have increased the extent of plaintiff's injuries, and can therefore be counted as one of the causes aggravating his injuries or bringing about his deplorable condition; and there was some medical testimony to this effect. We do not see how the trial court would have been justified in sustaining a demurrer because of the allegation of the petition that his injuries were the direct result of *each and all* of the negligent acts specified.

Nor can we agree to the proposition that the demurrer should have been sustained because the way in which plaintiff says he received his injury is contrary to physical laws. We cannot say that *conclusively* the withdrawal of a stake could not leave a hole sufficiently large for plaintiff's foot to enter and cause him to be thrown down, especially in view of the evidence as to the condition of the ground, the size and character of stakes used and the size of a hole that the withdrawal of such stakes in such ground can make. Plaintiff's foot may not have gone in as deep as he says or thought it did, but yet it could go in a sufficient distance to throw him down and injure him and for that defendant might be liable.

It is conceded that it was the custom to at once fill or cover all holes made by the removal of tent stakes, and hence it was defendant's duty to leave no unfilled or uncovered stake holes; and if the hole into which plaintiff stepped was a stake hole made and left uncovered by the defendant, then its culpability arose at once upon leaving said hole open, and in such case it is not necessary, in order to make a case of liability, that the hole should have existed a sufficient length of time to give notice of its existence. [Bodenmueller v. Columbia Box

Co., 237 S. W. 879.] Consequently, a demurrer to the evidence could not be successfully invoked because of the lack of evidence of the prior existence of the hole a sufficient length of time to give notice thereof. This observation may not be necessary in this connection, as we do not understand defendant to claim the demurrer should have been sustained on this ground; but this feature does have a bearing upon the case when we come to consider the instructions which will be disclosed in a discussion of them.

The two instructions upon which plaintiff's case was submitted are long, but we see no way to avoid the necessity of setting them out at length. They are as follows:

"No. 1. If you believe from the evidence that on or about August 20, 1918, plaintiff was in the employ of defendant on the circus lot in Kansas City, Missouri, mentioned in evidence, and while engaged in carrying seats and working under the orders of defendant and engaged in performing his duties as an employee of defendant, if you so find such to be the facts, the plaintiff stepped into a hole and was thereby injured, if you so find, and that said hole, if any there was, was made and left in said circus grounds by the removal of one of defendant's tent stakes, if you so find, and that said hole, if any there was, was of sufficient size and depth to permit one to step therein, if so, and that said hole and the premises at and about same were dark and unlighted and there was not sufficient light thereat and thereabout to enable the employees of defendant in doing said work and performing said duties to see said hole and said premises and perform said duties with reasonable safety, if you so find, and that by reason of the above facts, if you so find them to be the facts, the said hole, if any, and said premises were dangerous and not reasonably safe as a place to walk and perform said duties, if you so find, and that defendant knew or by the exercise of ordinary care could have known of all the aforesaid facts and con-

ditions, if you so find such to be the facts and conditions, before plaintiff was injured, if so, and long enough prior thereto for defendant by using ordinary care to have provided and maintained reasonably sufficient light, and made said place and premises reasonably safe as a place to work, if so, and that defendant failed to exercise ordinary care so to do, and was thereby guilty of negligence, if you so find, and that plaintiff stepped into said hole, if any there was, and was thereby injured, if you so find, as a direct result of such negligence, if any, on the part of defendant, and that plaintiff at said time and at all times referred to in evidence was exercising ordinary care for his own safety, if so, and that plaintiff was not injured as a result of any risk assumed by him, if so, as explained in other instructions herein, then your verdict will be for plaintiff under this instruction.

If your verdict is for plaintiff under this instruction you will take into consideration the nature and extent of his injuries, if any, which you believe from the evidence he sustained as a direct, exclusive and necessary result of his stepping into the hole, if any, whether or not such injuries, if any, so necessarily, exclusively and directly resulting as aforesaid are permanent, any physical pain and mental anguish, if any, which you believe from the evidence plaintiff has suffered and will with reasonable certainty hereafter suffer as a direct, exclusive and necessary result of such injuries, if any; any expense for hospital bills not exceeding $1500, and any expenses for doctor's bill not exceeding $550, which you believe from the evidence to be the direct, necessary and exclusive result of such injuries, if any; any wages which you believe from the evidence plaintiff has necessarily and directly lost as the exclusive and direct result of such injuries, if any, not exceeding lost wages to date $3000; any impairment, if any, of his ability to work and earn a livelihood after this date which you believe from the evidence to be the direct, necessary and exclusive result of such injuries if any, and if your verdict is for plain-

tiff under this instruction, you should award him hereunder such damages as you believe from the evidence will fairly and reasonably compensate plaintiff for his injuries, if any, so received, as the exclusive, direct and necessary result of stepping into said hole, if you so find such to be the facts, and your award, if any, hereunder will be stated in one sum.''

"No. 2.. If you believe from the evidence that on or ᴏut August 20, 1918, plaintiff was in the employ of defendant on the circus lot in question in Kansas City, Missouri, and that there was a stake hole on said premises, and that plaintiff stepped therein, if so, while performing his duties and obeying the orders of defendant, if so, and that thereby his leg was broken and he was so injured as to be helpless and in immediate need of first aid and emergency treatment, if so, and that plaintiff lay on the ground for a long time and was then carried by the employees of defendant, if so, and placed on a flat car, if so, and he remained there for the remainder of the night and part of the next day, and was moved thereon to Kansas, if so, and was then removed from said car and placed on the ground, if so, near the place of the next show of defendant, if so, and that all the aforesaid was done with the knowledge of defendant, if so, and that defendant knew of the injuries, if any, and the condition of plaintiff, if so, before he was moved from said circus lot in Kansas City, Missouri, and placed on said flat car, if so, then it was the legal duty of defendant to exercise ordinary care to procure and provide such reasonably sufficient first aid or emergency attention as would be commensurate with his injuries, if any, and immediately necessary for his then condition, and if you believe from the evidence that he had no medical attention until the following day after he was hurt, if so, and that defendant failed to exercise ordinary care to procure and provide first aid or emergency attention, as above set out, and that by such failure, if any, defendant was negligent, if so, and that as a direct result of such

negligence, if any, on the part of defendant, plaintiff suf-
fered from not having reasonably prompt emergency
treatment, if so, and was caused to suffer mental an-
guish and physical pain in addition to that which di-
rectly, exclusively and, necessarily resulted from step-
ping into said hole, if so, then you will find a verdict for
plaintiff under this instruction. If you find a verdict for
plaintiff under this instruction you will take into con-
sideration all physical pain and mental anguish, if any,
which you believe from the evidence he has suffered and
will with reasonable certainty hereafter suffer as a di-
rect result of any negligence, if any, on the part of de-
fendant regarding reasonably prompt emergency treat-
ment as aforesaid, and you will award such damages un-
der this instruction as you believe from all the evidence
will fairly and reasonably compensate plaintiff for such
injuries, if any, as you believe and find from the evidence
to be the direct result of him not having reasonably
prompt emergency treatment, if so, as above set out, but
you cannot award any damages under this instruction
for any injury directly and necessarily resulting from
plaintiff stepping into said hole, if so, which last matter
is submitted in another instruction.''

Under the allegations of the petition, the chief and
the efficient or fundamental cause of the injury was the
''hole which had been left in the ground by the removal
of one of defendant's said tent stakes by defendant's
employees under the superintendence of their superiors
in their work of taking down said tents.'' This is not a
general allegation as to any hole on the grounds, but is
necessarily the specific allegation of a hole made by the
employees, under superintendence, by the removal of a
tent stake in the taking down of the tent to which the stake
belonged. The petition did not name the particular tent,
but plaintiff's evidence is that it was the menagerie tent,
and it was the tent that had been taken down and whose
stakes had been recently pulled; and it was a hole that
was not there in the daytime or prior to the taking down

of said menagerie tent.  So that under the allegations of the petition, and by virtue of plaintiff's evidence, the hole that caused the injury was a menagerie tent stake hole produced by defendant's withdrawal of a stake in the taking down of that tent.  Instruction 1, however, does not submit the case upon the existence of that hole but merely of "a hole  .  .  .   and that said hole, if any there was, was made and left in said circus grounds by the removal of one of defendant's tent stakes," and instruction 2 speaks merely of "a stake hole on said premises." Does this broaden the issues?  The instructions do not submit the case on the existence of *any kind* of a hole on the premises since the hole is referred to as a *stake* hole and in instruction 1 it is a hole made by the *removal of a tent stake*.  And it would seem at first blush to be hypertechnical to say that the instructions are so worded as to submit the. question of the existence of a hole in broader terms than that contained in the petition and evidence.  Yet the petition specifies that it was a hole made by "defendant's employees under the superintendence of their superiors, in their work of taking down said tents" and plaintiff's evidence is that it was such a hole and that the tent taken down was a menagerie tent.  If there were no evidence of any other holes, or if the existence of the hole were conceded, we might well say the jury could not have failed to understand what hole was referred to and that the instruction could not possibly be deemed to apply to any other stake hole on the grounds. But the petition and evidence specify the hole as a menagerie tent stake hole left uncovered in taking down said tent and the existence of the hole was strenuously denied. The location of the hole was important because of the necessity of its being where plaintiff was ordered to work, because of the issue as to whether that place was sufficiently lighted, and because of the defendant's right to apprehend, from the allegations of the petition, that it was a stake hole left open in the taking down of its menagerie tent, and to come prepared with evidence to

show that no menagerie tent stake hole was there and that the ground there was sufficiently lighted. Moreover, the cause of the hole was important since there was no evidence of its prior existence whatever and hence a hole caused by the removal of a stake in any other manner than that *alleged in the petition* or at least in any manner which the open hole was not *at once* negligently *created* by defendant, would not render defendant liable. When, in addition to all this, it is found that plaintiff's own evidence shows that stakes are "pulled, driven and pulled, around a circus ground" and that "stake holes are around every circus ground;" that sometimes, in soft ground, stakes will "weave," that is, give to one side and come loose, it is readily seen that the stake hole which was submitted in the instructions may have been one which was not within the purview of the petition or the evidence. If the evidence afforded opportunity for the existence of any other hole than the one charged and shown, we cannot say that conclusively the jury knew and understood what hole was referred to in the instructions. Besides, instruction 1 seems to recognize that the hole might be one where defendant would have to have notice, either actual or constructive, of it, since it goes on to require that the defendant "knew or by the exercise of ordinary care could have known" of it. But this could not cure the instruction so as to permit recovery for any other hole than the specific one alleged and proved; nor was this clause permissible in the instruction since there was no evidence to justify the inclusion of such a clause. [Smith v. Sedalia, 162 Mo. 283.] In the case of Forrester v. Walsh Fire Clay Products, 231 S. W. 668, 675, the claim and the evidence was that plaintiff's injury was caused by a loose board left by the foreman. If it was left by a fellow-servant or some one else, the defendant had to have actual or constructive notice thereof before it would be liable. It was held that an instruction which submitted the question whether the defendant's *"agent*

or foreman" left the board there, broadened the issues. An instruction must not be broader than the case made by the evidence under the petition. [Degonia v. St. Louis, etc., R. Co., 224 Mo. 564, 589.] It will not do to say that the charge of negligence in failing to have sufficient light is merely one of the specifications of negligence and that the instruction, by submitting that specific negligence, is based on that and hence submits that negligence as specifically as that negligence is charged in the petition. For, as heretofore stated, the charge is that the negligent leaving of the hole *combined* with the lack of light caused the injury. It was not the lack of light *alone* that caused it. Indeed, the open hole did the injury, the lack of light being a cause in the sense that plaintiff was unable to see and avoid the hole.

With reference to instruction No. 2, it seems to us to clearly submit another *separate and distinct* cause of action for *actual* damages based upon a negligent failure to furnish aid or emergency treatment to plaintiff when defendant knew of his helpless condition; and the jury are told that if plaintiff, by reason of that negligence, suffered "mental anguish and physical pain in addition to that which directly, exclusively and necessarily resulted from stepping into said hole," they could find actual damages for him on that cause of action. We do not think a separate and distinct cause of action for actual damages based on negligent failure to care for plaintiff could properly be thus submitted to the jury under the pleadings in this case. A cause of action based on negligent failure to afford prompt aid and emergency treatment, may, under proper circumstances, arise. [Hunicke v. Meramec Quarry Co., 262 Mo. 560; Same v. Same, 189 S. W. 1167; Same v. Same, 212 S. W. 345.] We do not say that no cause of action, under the circumstances of this case, arises on that ground. What we do say is that the petition, as heretofore shown, stated a cause for *actual* damages *as a whole* based on the negligent leaving of the hole *and* failure to care for him thereafter,

whereby he was actually damaged in the sum of $25,000. The petition then charged that the failure to care for plaintiff in his helpless condition was "wanton, brutal and malicious," whereby plaintiff was entitled to exemplary or punitive damages. The practical effect of the way the case was submitted was to allow the jury to award actual damages for what the petition claimed as a whole and then allow still further damages for the neglect of plaintiff after he was hurt. While the instruction 2 does not call them punitive damages, yet this is, in effect, what they are, and the instruction permits their recovery without requiring the jury to find that such neglect was "wanton, brutal and malicious" or "in brutal disregard of the dictates of law and humanity."

That plaintiff, by thus submitting his case on the two instructions, sought to recover upon two separate and distinct causes of action is still more clearly shown when we consider plaintiff's instruction No. 5 which told the jury, in effect, that they could find for plaintiff under instruction 1 and that he was not entitled to recover under instruction No. 2, in which case their verdict should be in such-and-such a form; or they could find for plaintiff under instruction 2 and not under instruction 1, in which case their verdict would be in such-and-such a form. We cannot see how the petition in this case justifies the submission of the case in any such manner.

Wherefore the judgment is reversed and the cause is remanded for a new trial. The other judges concur.